**UNITED STATES of America**

v.

**Reginald E. DAVID, Appellant.**

**No. 72–2149.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 25, 1975.

Decided Jan. 30, 1975.

---

Michael Schatzow, with whom Larry J. Ritchie, Washington, D. C. (both appointed by this Court), was on the brief for appellant.

Steven R. Schaars, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., John A. Terry and Roger M. Adelman, Asst. U. S. Attys., were on the brief for appellee.

Before BAZELON, Chief Judge, and WRIGHT, Circuit Judge and MERHIGE,* United States District Judge for the Eastern District of Virginia.

BAZELON, Chief Judge:

On August 16, 1972, Reginald E. David was convicted in a non-jury trial of assault with intent to commit rape while armed,[1] taking indecent liberties with a minor,[2] and sodomy.[3] Testimony at trial indicated that on October 28, 1971 the 13 year old prosecutrix was walking with two young girl friends in the parking lot of Robert F. Kennedy Stadium. A man approached them in a green car. The man—identified at trial by all three girls as the appellant—left his car and began chasing them. While two of the girls eluded him, he caught up with the prosecutrix, ripped her slacks off, attempted to have intercourse with her, and compelled her to commit various sodomous acts at knife point. He then released her.

In the meantime, the two other girls met a policeman and alerted him to the danger confronting their friend. He went immediately to the parking lot where he and a fellow officer found David crouching in a bush near the lot with an open knife in his hand. They arrested David after both girls identified him as the man in the green car.

I

Treatment of the central issues raised on appeal requires a detailed description of the several reports and proceedings relating to David's mental condition both at the time of the offense and at the time of trial.

Four days after the instant offense, a United States Magistrate ordered, on request of defense counsel, that David be examined by the Legal Psychiatric Serv-

---

* Sitting by designation pursuant to 28 U.S.C. § 292(d).

1. 22 D.C.Code §§ 501, 3202.

2. 22 D.C.Code § 3501(a).

3. 22 D.C.Code § 3502.

ice to determine whether he was "competent for trial and whether [he] was suffering from a mental disease or defect at the time of the alleged offenses and whether those offenses, if committed by [him], were a product of such mental disease or defect."

Pursuant to this order, David was examined in his cell block by Dr. Leonard C. Maguigad, a staff psychiatrist with the Legal Psychiatric Service. Maguigad, in his report to the Magistrate dated December 10, 1971, found that David was incompetent to stand trial. He also reported that David was "suffering from schizophrenia at the time of the alleged offense, but I have no opinion at this time as to productivity." He "highly recommend[ed] that [David] receive hospital treatment at this time."

Maguigad's letter to the Magistrate also disclosed that David had a prior psychiatric history. David revealed to Maguigad that, while employed as a police officer in the summer of 1970, "he had a 'nervous breakdown' which led to the termination of his services from the police force." Maguigad reported that the records he obtained from the D.C. Police and Fireman's Clinic "confirm that [David] had psychotic symptomatologies and had been diagnosed Schizophrenia Paranoid Type in [sic] August 3, 1970. He had been hospitalized at Washington Hospital Center for his psychosis and had been committed to St. Elizabeths Hospital during the summer months of 1970."

On February 9, 1972, David was arraigned before the District Court in this case. At that time, the District Court, again on defendant's motion, ordered that he be committed to St. Elizabeths Hospital for an examination both as to his competency to stand trial and as to his mental condition at the time of the offenses for which he was charged.[4] Pursuant to that order, David was examined by Dr. Robert H. Robertson, a staff psychiatrist at St. Elizabeths who consulted with Dr. Robert O. Randle, a staff psychologist at the hospital. On the ba-

sis of their examination, Dr. Elizabeth Strawinsky, Acting Associate Director for Forensic Programs at St. Elizabeths, reported in a letter to the court that David had been "diagnosed No mental disorder and is competent for trial by virtue of having a rational as well as factual understanding of the proceedings pending against him and being able to consult with counsel with a reasonable degree of rational understanding." Strawinsky further reported that "on or about October 28, 1971, the date of the alleged offenses, [David] was not suffering from a mental disease or defect which substantially impaired his behavior controls, and the alleged offenses, if committed by him, were not the product of an abnormal mental condition." Thus, at the time of the trial, the reports of Dr. Maguigad and St. Elizabeths conflicted as to both the questions of competency to stand trial and mental condition at the time of the offense.

At the trial's outset, David's counsel presented the court with what he perceived to be a "dilemma." After noting the two conflicting reports on David's competency, counsel stated that "my position at this point is to alert the Court to the fact that I have misgivings about my client's competency which I think warrants an inquiry of some sort at this point." While counsel was not specific as to the basis for his misgivings, he did indicate that "it has to do with Mr. David's apparent lack of appreciation of what the Government's evidence against him is and the corresponding inability to consider the wisdom of taking a course other than standing trial on the merits." Counsel made clear that while he was calling the "dilemma" to the court's attention, he was doing so not at the direction of his client. He stated explicitly that "Mr. David does not want me to assert his incompetence."

On considering defense counsel's statement, the trial court decided to hold a hearing into David's competency. Prior to doing so, the court called a brief recess to allow Dr. Maguigad, who had

4. The order was issued in accordance with 24 D.C.Code § 301.

arrived in court, to meet once again with David in his jail cell and to allow the government time to contact St. Elizabeths authorities in the event they were needed to testify.

The recess—and Dr. Maguigad's "reexamination" of David—lasted no longer than thirty minutes.[5] When court reconvened Maguigad was called as a witness and testified that, on the basis of the interview he had just conducted, he now felt that David was competent to stand trial. He stated that, in contrast to the last time that he had met David, "he was accommodating and cooperative and seem[ed] to be warm and . . . less guarded. He understands the procedures that are forthcoming to him. He understands the fashion of the prosecution and the defense. He is more realistic about what is happening now." In response to a question from the court, Dr. Maguigad further stated that in his opinion David now was competent to waive a jury trial. Maguigad's testimony was limited to the competency issue; he gave no indication that he had altered his earlier opinion that at the time of the offense David was suffering from schizophrenia.

On the basis of Dr. Maguigad's change of opinion and without the testimony of any other witnesses, the trial court declared David competent to stand trial. Neither party raised any objection to this ruling.

Following the competency ruling, defense counsel proffered to the trial court a waiver of David's constitutional right to a jury trial and requested the trial court to "inquire of Mr. David directly."[6] In response to this request, the trial judge conducted a three ques-

tion inquiry of David.[7] After this inquiry, defense counsel stated that "I have explained before Mr. David actually signs this waiver that the technical difference is that the Government has to convince 12 people beyond a reasonable doubt in a jury trial and that a waiver of jury trial makes Your Honor a judge of both fact and law."

After the court then accepted defendant's signed waiver, defense counsel offered one additional matter before the first trial witness was called. Counsel stated that the defendant was choosing not to raise the insanity defense and that "if and when it does come into the trial, it will be with Your Honor's discretion." The trial court chose not to interpose the insanity defense sua sponte at that point[8] and stated that she "felt that St. Elizabeths had an opportunity to observe the defendant at considerable length and Dr. Maguigad had not and that, indeed, perhaps, that was why, when he saw the defendant today, he changed his opinion as to his condition, since he had seen him only briefly, I believe in the cellblock before." At no point during the balance of the trial was the question of an insanity defense raised again by either party or by the court.

## II

At issue in this case are a) the adequacy of the competency hearing; b) the adequacy of the interrogation of the defendant on his jury trial waiver; and c) the adequacy of the basis for the trial judge's refusal to interpose the insanity defense sua sponte.

### A

■ With regard to the first issue, appellant and appellee are agreed as to the

---

5. The transcript indicates that the morning's proceedings began at 10:10 A.M. From the length of the transcript, it can be estimated that the proceedings before the recess took at least ten minutes. Court reconvened *after* the recess at 10:50 A.M.

6. This was, in fact, the second time that David's counsel had indicated that he thought such inquiry would be necessary. Earlier in the proceedings counsel had stated: "I have discussed with Mr. David the possibility of

waiving the jury and he says that is all right with him and in point of fact I would advise it of him. *And certainly at that juncture, I would ask the court to inquire closely of Mr. David.*" Transcript, page 7 (emphasis added).

7. The full record of that inquiry is presented at page 361 *infra.*

8. The government was told by the trial judge that it did not have to present testimony to rebut an insanity defense.

standard against which competency is to be measured. The test is whether a defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). David claims that the trial judge's hearing into his competency was insufficiently comprehensive to adequately apply that standard. He asserts that the trial court erred in not further questioning defense counsel on the source and scope of his stated "misgivings" as to David's competency. Moreover, in making his competency ruling, the trial court posed no questions to David himself.

The government asserts, on the other hand, that the inquiry conducted by the trial court was sufficient. Relying on the fact that after Maguigad's change of opinion no outstanding expert opinion reported David incompetent to stand trial, the government claims that the trial judge was fully justified in ruling David competent without making further inquiry.

■ This court recognizes that in making a competency determination[9] it may be very useful for the trial judge to question both the defendant and his counsel;[10] the applicable criteria measure one's ability to consult *with his lawyer* and to understand the course of *legal* proceedings. Thus counsel's first-hand evaluation of a defendant's ability to consult on his case and to understand the charges and proceedings against him

may be as valuable as an expert psychiatric opinion on his competency. This is particularly so when—as in the instant case—trial counsel has independently expressed "misgivings" about the defendant's competency. The trial judge would therefore have been well-advised—even after Dr. Maguigad had changed his opinion—to conduct further inquiry of defense counsel and of David himself. However, because we dispose of this case on another issue, it is unnecessary to decide whether her failure to do so constitutes reversible error.

### B

■ As with other constitutional rights, a waiver of the right to trial by jury should be accepted by a trial judge only after fulfilling "the serious and weighty responsibility . . . of determining whether there is an intelligent and competent waiver by the accused."[11] In the leading case in the area, the Supreme Court made clear the important role played by the jury trial in our judicial system and the consequent need to be extremely cautious in approving its waiver:

> "Not only must the right of the accused to a trial by a constitutional jury be jealously preserved, but the maintenance of the jury as a fact-finding body in criminal cases is of such importance and has such a place in our traditions, that, before any waiver can become effective, the consent of government counsel and the sanction of the court must be had, in addition to the *express and intelligent consent* of the defendant. *And the duty of the*

---

9. The determination must be that of the trial judge. "[I]t is the duty of the District Court to make a specific judicial determination of competence to stand trial, rather than accept psychiatric advice as determinative on this issue." Cooper v. United States, 119 U.S. App.D.C. 142, 337 F.2d 538, 539 (D.C.Cir. 1964) (Wright, J., concurring), cert. denied, 382 U.S. 1029, 86 S.Ct. 653, 15 L.Ed.2d 542 (1966).

10. "Judicial questioning of the accused and his trial counsel may be of special use in revealing whether the defendant is able to

assist in the defense of his case." Cooper v. United States, 337 F.2d 538, 539 n. 4 (D.C.Cir. 1964) (Wright, J., concurring).

11. Cross v. United States, 325 F.2d 629, 631 (D.C.Cir. 1963) quoting Johnson v. Zerbst, 304 U.S. 458, 464–465, 58 S.Ct. 1019, 82 L.Ed.2d 1461 (1938). "[C]ourts indulge every reasonable presumption against waiver of fundamental constitutional rights and . . . do not presume acquiescence in the loss of fundamental rights." *Id.*

*trial court in that regard is not to be discharged as a mere matter of rote, but with sound and advised discretion,* with an eye to avoid unreasonable or undue departures from that mode of trial or from any of the essential elements thereof, and with a caution increasing in degree as the offenses dealt with increase in gravity." Patton v. United States, 281 U.S. 276, 312–313, 50 S.Ct. 253, 263, 74 L.Ed. 854 (1930) (emphasis added).

■ As a means of protecting the constitutional right, Rule 23(a) of the Federal Rules of Criminal Procedure insures that absent the defendant's consent, a trial covered by the constitutional guarantee will not go forward without a jury: "Cases required to be tried by jury shall be so tried unless the defendant waives a jury trial in writing . . . "

■ While Rule 23(a) insures that there be a documentary manifestation of the defendant's consent, that provision of course does not guarantee that the waiver is knowing and intelligent.[12] Many courts—including our own—have indicated that trial judges would be well-advised to directly question the defendant in all cases to determine the validity of any proffered waiver of jury trial.[13] Such questioning is of course particularly crucial where circumstances cast doubt on the validity of a given waiver.[14] In the instant case detailed interrogation of David was clearly mandated in light of Dr. Maguigad's original competency report,[15] appellant's substantial psychiatric history,[16] and counsel's expressed concern both as to appellant's competency[17] and his ability to knowingly waive his jury trial right.[18]

■ While the trial judge did direct three questions to appellant concerning the proffered waiver, these inquiries were patently inadequate when viewed against the above circumstances. The entire interrogation of David was as follows:

THE COURT: Mr. David, you understand, do you, that you have a constitutional right to be tried by a jury and if you would like to be, that is your wish?

We understand from your counsel that you have indicated that you wish to waive your jury trial and be tried by the Court. Is that correct?

THE DEFENDANT: Well, so far as I am concerned, it really doesn't make that much difference. Well, not being that familiar with this type of thing, I wouldn't know whether it would be to my advantage or disadvantage.

---

12. *See e. g.,* Chalk v. Beto, 429 F.2d 225 (5th Cir. 1970).

13. United States v. Straite, 138 U.S.App.D.C. 163, 425 F.2d 594 (1970); Estrada v. United States, 457 F.2d 255 (7th Cir.), cert. denied, 409 U.S. 858 (1972); United States v. Mitchell, 427 F.2d 1280 (3rd Cir. 1970); United States v. Hunt, 413 F.2d 983 (4th Cir. 1969). See Recommendations of ABA Project on Minimum Standards for Criminal Justice (Trial by Jury), Part I, § 1.2(b); Orfield, Criminal Procedure Under the Federal Rules, § 23:43 at p. 67. Concededly, some of the same courts have been reluctant to establish such questioning as a prophylactic *requirement* applicable to all jury trial waiver situations. *See, e. g.,* United States v. Straite, 138 U.S.App.D.C. 163, 425 F.2d 594 (1970); Estrada v. United States, 457 F.2d 225 (7th Cir. 1972); United States v. Mitchell, 427 F.2d 1280 (3rd Cir. 1970). *But see* Jackson v. United States, 262 A.2d 106 (D.C.Ct. of App.1970).

14. In rejecting a prophylactic interrogation requirement, some courts have *implied* that in individual cases trial court interrogation of the defendant might be necessary. *See* United States v. Mitchell, 427 F.2d 1280 (3rd Cir. 1970); Hatcher v. United States, 122 U.S.App.D.C. 148, 352 F.2d 364 (1965), cert. denied, 382 U.S. 1030, 86 S.Ct. 654, 15 L.Ed.2d 542 (1966); *see also* Naples v. United States, 113 U.S.App.D.C. 281, 307 F.2d 618, 625–626 (1962). Moreover, the necessity of judging waivers on a case-by-case basis has long been recognized by this court. "Whether there has been an intelligent waiver depends upon the facts and circumstances of a particular case including the background, experience, and conduct of the accused. . . . Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)." Naples v. United States, 113 U.S.App.D.C. 281, 307 F.2d 618, 625 (D.C. Cir. 1962).

15. See pp. 2–3 *supra.*

16. See p. 3 *supra.*

17. See pp. 4–5 *supra.*

18. See p. 6 & n. 6 *supra.*

THE COURT: Do you rely upon your attorney's recommendation?

THE DEFENDANT: Really, I have no other alternative. I am assuming that he is a competent attorney.. I am hoping that he is.

THE COURT: The Court has always found him to be.

Far from stilling doubts as to the validity of David's waiver, the above interrogation exposes—without resolving—important issues such as whether David understood that he had a right to be tried by a jury, whether he understood the difference between a jury trial and a non-jury trial and whether he was mechanically following his attorney's advice without having its basis explained to him. The questioning also left unexplained what David meant when he said "I have no other alternative." Did he mean that he somehow felt legally obligated to follow his attorney's recommendation? Was any effort made to explain to him "whether [waiving a jury trial] would be to [his] advantage or disadvantage"?

■ Defense counsel's statement that he had explained to David the "technical difference" between a jury trial and a non-jury trial does not make up for the shortcomings in the trial judge's interrogation. The statement does not reveal whether David *understood* even the "technical" differences between the two modes of trial, much less whether the advantages and disadvantages of each were explained to him or whether he realized that he had a constitutional right to elect a jury trial—notwithstanding contrary advice from counsel.

■ From all that appears from the record before us, the brief questioning of David did little, if anything, to inform the trial judge as to whether the waiver was knowing and voluntary.[19] Only further inquiry would have enabled the trial court to rule on the waiver's validity not "as a mere matter of rote, but [rather] with sound and advised discretion." Patton v. United States, 281 U.S. 276, 312–313, 50 S.Ct. 253, 263, 74 L.Ed. 854 (1930).

[11] We hold not that David's waiver was involuntary or unintelligent but rather that there was an insufficient basis for determining its validity. However, because of the inherent ambiguities and difficulties in retrospectively determining the validity of a waiver made over two years ago, we do not choose to dispose of this case by ordering a fuller inquiry into the validity of the 1972 waiver. We elect rather to follow the

---

19. The trial judge's prior ruling that David was competent to stand trial—even if correct—is not determinative on the issue of the validity of David's jury trial waiver. While David's level of awareness and comprehension might have been high enough to render him competent to stand trial, it may not have been high enough to allow him to validly waive his constitutional right to a trial by jury or it may have called for a more patient and detailed explanation to him of the nature of that right. *See* In Re Williams, 165 F.Supp. 879 (D.D.C.), order modified on other grounds, 104 U.S.App.D.C. 18, 259 F.2d 175 (1958), cert. denied, 379 U.S. 982, 85 S.Ct. 689, 13 L.Ed.2d 572 (1965). Although Dr. Maguigad did indicate—on the basis of his short reexamination of David—that he thought David was competent to waive his jury trial right, the surrounding circumstances, see pp. 10–11 *supra,* still called for a detailed trial court interrogation.

This court confronted a problem similar to that presented in the instant case in Naples v. United States, 307 F.2d 618 (1962). There a defendant with a psychiatric history had, like David, been ruled competent to stand trial. After cursory questioning by the trial judge, his jury trial waiver was accepted. On appeal, he challenged the validity of his waiver. Because his conviction was reversed on other grounds, this court did not resolve the jury trial waiver question. However, recognizing that "whether this appellant was capable of 'deciding what is best for himself' is a very serious question" we indicated that "it might have been expected . . . that the judge's determination to approve the waiver of a jury trial would have been supported by findings adequate to sustain his ruling. Particularly would such a course have been appropriate here, in a capital case, with a two-year, pre-trial record *indicating the possible presence of a substantial mental disorder.*" Naples v. United States, 307 F.2d 618, 626 (D.C.Cir. 1962) (emphasis added).

course set by the Supreme Court in Dusky v. United States[20] and, accordingly, remand this case for a new trial.

### C

Since the question of imposing the insanity defense may well arise in the new trial in this case, it is appropriate to provide some guidance thereon for the trial court on remand.

In Whalem v. United States, 120 U.S. App.D.C. 331, 346 F.2d 812, cert. denied, 382 U.S. 862, 86 S.Ct. 124, 15 L.Ed.2d 100 (1965), this court held that in certain circumstances a trial court is obligated to impose an insanity defense and submit it to the jury against the wishes of the defendant.[21] *Whalem,* however, left open the question of under what conditions the trial judge should conduct a full inquiry into *whether* to impose the insanity defense.

We treated this further question in United States v. Robertson, 507 F.2d 1148 (decided October 22, 1974). There the defendant had refused to assert the insanity defense. However, faced with conflicting and potentially credible expert opinions on the issue of defendant's mental condition, the trial court decided to hold a hearing into the matter. Approving that decision[22]—while viewing as inadequate the hearing that was actually held[23]—this court stated that:

"When a 'sufficient question' is potentially posed by differing views of experts, the trial judge must conduct on the record a thorough exploration of the same and in addition set forth in

reasonable detail the reasons for his own ultimate determination." United States v. Robertson, *supra,* at 1161.

Thus, at least where the view supporting the insanity defense is not inherently incredible, one "trigger" for further inquiry is "differing views of experts." When such differing views exist, their presentation in an on-the-record inquiry would aid the trial judge in exercising his discretion in an informed manner and would allow the appellate court to intelligently review that exercise for signs of abuse.[24]

---

**20.** 362 U.S. 402, 403, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960).

**21.** "[W]hen there is sufficient question as to a defendant's mental responsibility at the time of the crime, that issue must become part of the case . . . [O]ur query is whether . . . there [is] a combination of factors which require the trial judge to inject the insanity issue for, if such factors existed, his failure to do so is an abuse of discretion and constitutes error." Whalem v. United States, 120 U.S.App.D.C. 331, 346 F.2d 812, 818–819 (1965). Recognizing the complex of factors that might legitimately affect the trial court's decision whether to impose the insanity de-

fense, this court further stated in *Whalem* that "[n]o rigid standard exists to control the District Court in deciding whether it should require the insanity defense to be submitted. As a matter within the sound discretion of the District Court, the question must be resolved on a case by case basis." 346 F.2d at 819, n. 10.

**22.** United States v. Robertson, No. 72–1781 (decided October 22, 1974), at 1158.

**23.** *Id.* at 1158–1160.

**24.** *Id.* at 1161.