UNITED STATES of America

v.

Johnnie MASTHERS, Appellant.

No. 74–1602.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 28, 1975.

Decided April 14, 1976.

Rehearing En Banc Denied June 15, 1976.

Arthur Lowy, Washington, D. C. (appointed by this Court) with whom Nathan Rubinstein, was on the brief for appellant.

Robert Plotkin, Washington, D. C., and Paul Friedman for the Mental Health Law Project as amicus curiae.

Edward C. McGuire, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, Stuart M. Gerson and David M. Bullock, Asst. U. S. Attys., Washington, D. C., were on the brief for appellee.

Before BAZELON, Chief Judge, HASTIE,[*] Senior Circuit Judge for the Third Circuit and ROBB, Circuit Judge.

Opinion filed by Chief Judge BAZELON.

Concurring opinion filed by Circuit Judge HASTIE.

Dissenting opinion filed by Circuit Judge ROBB.

BAZELON, Chief Judge:

These motions to vacate a plea of guilty (28 U.S.C. § 2255) and to withdraw the plea (Rule 32(d) of the Federal Rules of Criminal Procedure) are based on appellant's claim of incompetence at the time the plea was entered. Since we find that the record does not "conclusively show that the prisoner is entitled to no relief," [1] it follows that the district court erred in denying these motions without a hearing.

I.

Appellant and a co-defendant were charged in a three-count indictment with

---

[*] Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. 28 U.S.C. § 2255. *See infra,* n. 35.

armed robbery,[2] robbery,[3] and assault with a dangerous weapon.[4] The charges stemmed from a robbery of a gas station and one Leon Henderson; $104 in cash and a $60 watch were taken.

There were indications from the very outset that appellant was mentally deficient. At pretrial appointed counsel moved for a *Miranda* hearing, asserting that appellant had not knowingly and intelligently waived his Fifth Amendment rights. At the pretrial appearance, the prosecutor admitted that "there may be some difficulty with the confession" and that he "may not use it."[5] Papers filed in connection with the proceedings below reveal that appellant could not sign his name; when his signature was required, appellant printed his name in scrawling block letters.[6]

Upon entry of the guilty plea on November 26, 1973, when the trial court addressed appellant personally,[7] he simply responded, "Yes, Ma'am" or "No, Ma'am" to all but one[8] of the court's queries.[9] The complaining witness, Mr. Henderson, thereupon expressed to the court his belief that appellant was a "good" but "illiterate" man who must have been "put up to" the crime, and urged that he not be incarcerated.[10] Appellant's counsel specifically suggested, and the court apparently agreed, that "in the presentence aspect of this case . . . some attention [be] paid to the psychological aspect," and that a suitable program of rehabilitation be devised.[11]

Sentencing was delayed pending preparation of a presentence report and an evaluation of appellant's suitability for rehabilita-

2. 22 D.C.Code §§ 2901, 3202.

3. 22 D.C.Code § 2901.

4. 22 D.C.Code § 502.

5. Transcript of November 5, 1973 Hearing, p. 2.

6. *See* Pretrial Release form, November 26, 1973, and Affidavit in Support of Application to Proceed without Prepayment of Costs, April 5, 1974.

7. F.R.Cr.Pro., Rule 11, 18 U.S.C.

8. When asked his age, appellant stated, "Twenty-three." Transcript of November 26, 1973 Hearing, p. 7.

9. Transcript of November 26, 1973 Hearing, pp. 2–8.
   At one point the court stated, "Mr. Masthers, you have heard the allegations made by the Assistant United States Attorney." When asked if he had "any corrections or additions to make to what [the Assistant United States Attorney] said, or any explanation of [his] own," appellant remained silent. When the court rephrased its inquiry, asking "Is that correct?" appellant characteristically replied, "Yes, Ma'am." Transcript of November 26, 1973 Hearing, p. 6.

10. Mr. Henderson's full statement was as follows:
    MR. HENDERSON: * * *
    Your Honor, I believe in my heart, I believe that he didn't do this on his own, that he was put up to do this, and I wish you would take that into your judgment that he didn't because as long as I been knowing him, he

hasn't did nothing but work on the trash truck on his route, and how it was—how he got—that fellow—what his name—Snow [appellant's co-defendant] or whatever it is—to put him up to it, I don't believe it is in him, and I would appreciate, Your Honor, if you would please give him a break because if he go to jail he is not going to be no good when he get out.
    MR. LOWY: Your Honor, if Mr. Henderson would like to tell Your Honor about what he considers, based on what he knows about Mr. Masthers, about his mental state, and the kind of mind that he has, and whether he—would you like to tell the judge about that?
    MR. HENDERSON: Well, in my opinion, Your Honor, in my opinion, the man is—he is a good man because he is a hard-working man. I have seen him work.
    But to my opinion—I don't know whether he like it or not—but he is illiterate.
    Do you understand what I mean? He has been deprived of his education and he is from where I am from, from the South, and he hasn't had the education that he needs, and he is, you know, he is readily led by somebody that is smart, you know, like one of these gangsters or something like that, and that is the only reason I can see that he did it because it is not him, it is not in him. I have known him that long. It is not in him.
    Because he has asked me for things. He has never took nothing. He has asked me for things. And that is what surprised me. Transcript of November 26, 1973 Hearing, pp. 5–6.

11. Transcript of November 26, 1973 Hearing, p. 9.

tion under the Narcotics Addict Rehabilitation Act.[12] Appellant's "extremely low level of intelligence" and his lack of any "concept of time" were stressed throughout the presentence report.[13] The NARA staff found appellant's narcotic addiction to be questionable, and recommended "special educational or vocational training"[14] rather than NARA treatment, since "his mental capabilities would hinder him extremely in [NARA's] type of intensive, therapeutic program."[15] Again, appellant's low level of intelligence was noted, supported by the results of the Revised Beta Intelligence Test, on which appellant scored 57,[16] and

the Stanford Achievement Test, on which he scored 2.2, indicating that he operates "at slightly above the second grade level of academic achievement."[17]

At sentencing on March 28, 1974, counsel reminded the court of appellant's "extraordinarily low intelligence,"[18] and suggested probationary supervision. When asked about a pending marriage to an old girlfriend, appellant told the court that "we haven't been together for about three years and we were getting married this month or last month, like she is expecting a kid."[19] The trial judge replied, "Not yours, I take it," to which appellant responded, "I don't

---

**12.** 18 U.S.C. § 4251 et seq.

**13.** See Presentence Report, December 26, 1973, pp. 6, 8.

The probation officer who prepared the report indicated that during the interview appellant

. . . sat with a constant smile upon his face, this especially noticed when he attempted to respond to frankly asked questions. He does not appear to either initiate or hold his own during a conversation but must be questioned specifically at each instance in which the average person would anticipate the response and be immediately ready to respond with the answer. He would appear to be a loner, probably selecting those few with similar intelligence as members of his peer group. *Id.*

Although appellant claimed a fifth-grade education, the probation office staff "questioned whether he had actually attained anywhere near a fifth grade education while in school." *Id.* at 7.

**14.** United States Department of Justice, Bureau of Prisons, Federal Correctional Institution, Milan, Michigan, Classification Study, February 27, 1974, p. 3 [hereinafter referred to as Classification Study].

**15.** *Id.,* cover letter of Warden Beall.

**16.** The Classification Study reported that his 57 IQ places appellant "in the 'mentally defective' category." *Id.* at 2.

Appellant's IQ would place him in the "mildly retarded" category under the schemes most widely used today. The following table, adapted from Simmons, Tymchuk and Valente, "Treatment and Care of Mentally Retarded," 4 *Psychiatric Annals* 38, 42 (1974), summarizes the two major systems for classifying the degrees of severity of mental retardation in terms of IQ:

TABLE 1

| Level of Retardation | APA's DSM-II * | I.Q. Ranges AAMD ** | |
|---|---|---|---|
| | | Stanford-Binet and Cattell IQ Test | Wechsler IQ Scales |
| Borderline | 68–83 | | |
| Mild | 52–67 | 52–68 | 55–69 |
| Moderate | 36–51 | 36–51 | 40–54 |
| Severe | 20–35 | 20–35 | 25–39 |
| Profound | 0–20 | 0–19 | 0–24 |

\* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders II (1968).

\*\* American Association on Mental Deficiency, Manual on Terminology and Classification in Mental Retardation (Grossman, Ed. 1973).

IQ alone, however, is not a definitive measure of retardation. "[A] diagnosis of mental retardation is based on multiple criteria, including measured intelligence (usually quantified as Intelligence Quotient), adaptive behavior level (sometimes quantified as a Social Quotient), and medical classification." Roos, "Basic Facts About Mental Retardation," in *Legal Rights of the Mentally Handicapped*, p. 19 (Ennis and Friedman, Eds. 1973). The American Association on Mental Deficiency defines mental retardation as "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifest during the developmental period." American Association on Mental Deficiency, Manual on Terminology and Classification, *supra*, at 5. See also Hughes, "Definition, Diagnosis, Classification and Associated Problems in Mental Retardation," *Law & Psychology Review* 17 (Spring 1975).

**17.** Classification Study, at 3.

**18.** Transcript of March 28, 1974 Hearing, p. 6.

**19.** *Id.* at 4–5.

know." [20] The court imposed a sentence of two to six years.

After a motion for reconsideration and reduction of sentence was denied, appellant filed the present motions to vacate the plea of guilty under 28 U.S.C. § 2255 and to withdraw the plea under Rule 32(d), F.R.Cr. Pro.

## II.

It is "fundamental to an adversary system of justice" [21] that an individual whose "mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense" [22] may not be subjected to a trial.[23] The conviction of an accused who is mentally incompetent violates due process.[24] Where the "circumstances generat[e] a substantial doubt as to the accused's competence . . . a suitable hearing must be held." [25]

It is axiomatic that an accused must be competent to enter a valid guilty plea: "A plea of guilty . . . is itself a conviction. Like a verdict of a jury it is conclusive. More is not required; the court has nothing to do but give judgment and sentence." [26] A defendant who enters such a plea waives "his privilege against compulsory self-incrimination, his right to trial by jury, and his right to confront his accusers." [27] The test of validity of the waiver is whether it is "an intentional relinquishment or abandonment of a known right or privilege." [28] If a plea is not "equally voluntary and knowing, it has been obtained in violation of due process and is therefore void. Moreover, because a guilty plea is an admission of all the elements of a formal criminal charge, it cannot be truly voluntary unless the defendant

---

**20.** *Id.* at 5.

The judge then explained to appellant that it would be reasonable to assume that, under the circumstances, the child was not his.

**21.** *Drope v. Missouri*, 420 U.S. 162, 172, 95 S.Ct. 896, 904, 43 L.Ed.2d 103, 113 (1975).

**22.** *Id.* at 171, 95 S.Ct. at 903, 43 L.Ed.2d at 113.

**23.** The prohibition against trying an incompetent defendant has early common law origins. *See* 4 *Blackstone's Commentaries* 24 (9th Ed. 1783). It was said to be the law from the earliest times that ". . . if it is found at the trial of the prisoner that he cannot understand the proceedings, the judge ought to discharge the jury and put an end to the trial, or order a verdict of not guilty." *Reg. v. Berry, L.R.,* 1 Q.B.D. 447, 451 (1876), *cited in* "The Accused Retardate," 4 *Col.Hum.Rights L.Rev.* 239, 242 (1972).

In *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), the Supreme Court enunciated the test for competency: whether the accused "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." This standard is codified by 24 D.C.Code § 301(a) (1973).

**24.** *Drope v. Missouri, supra,* n. 21; *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15

L.Ed.2d 815 (1966); *Bishop v. United States*, 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956).

**25.** *United States v. Caldwell and Timm,* n. 61 (D.C.Cir.), *cert. denied*, 423 U.S. 1087, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976). *See Pate v. Robinson, supra,* n. 24, 383 U.S. at 385–6, 86 S.Ct. at 842, 15 L.Ed.2d at 822; *Grennett v. United States*, 131 U.S.App.D.C. 202, 403 F.2d 928, 932 (1968); *Hansford v. United States*, 124 U.S.App.D.C. 387, 365 F.2d 920, 924–5, *reh. denied*, 127 U.S.App.D.C. 359, 384 F.2d 311 (1966).

**26.** *Kercheval v. United States*, 274 U.S. 220, 223, 47 S.Ct. 582, 583, 71 L.Ed. 1009, 1012 (1927). *See, Machibroda v. United States*, 368 U.S. 487, 493, 82 S.Ct. 510, 513, 7 L.Ed.2d 473, 478 (1962); *Sieling v. Eyman*, 478 F.2d 211, 213 (9th Cir. 1973).

**27.** *McCarthy v. United States*, 394 U.S. 459, 466, 89 S.Ct. 1166, 1171, 22 L.Ed.2d 418, 425 (1969) (footnote omitted). *See Boykin v. Alabama*, 395 U.S. 238, 243, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274, 279 (1969). *See generally*, Bishop, "Waivers in Pleas of Guilty," 60 F.R.D. 513 (1974); Comment, "The Guilty Plea as a Waiver of Rights and as an Admission of Guilt," 44 *Temple L.Q.* 540 (1971).

**28.** *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466 (1938).

possesses an understanding of the law in relation to the facts." [29]

■ A defendant's competency must be assessed "with specific reference to the gravity of the decisions with which [he] is faced." [30] Whether an accused is capable of making the "reasoned choice" [31] essential to the validity of a guilty plea and the waiver of constitutional rights such as the plea entails "depend[s] . . . upon the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused." [32]

■■ A petitioner who lacked the capacity to have entered an intelligent plea may withdraw his plea pursuant to Rule 32(d), F.R.Cr.Pro., [33] and/or collaterally attack his conviction and sentence pursuant to 28 U.S.C. § 2255. [34] One who seeks such relief must be offered an opportunity to present evidence at a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief . . . ." [35]

■ The trial court did not, and indeed could not, rely upon such a showing in the instant case. [36] Instead, it denied relief

**29.** *McCarthy v. United States, supra,* n. 27, 394 U.S. at 466, 89 S.Ct. at 1171, 22 L.Ed.2d at 425 (footnotes omitted).

**30.** *Sieling v. Eyman, supra,* n. 26 at 215 (footnote omitted). Relying on *Westbrook v. Arizona,* 384 U.S. 150, 86 S.Ct. 1320, 16 L.Ed.2d 429 (1966), which distinguished between competence to stand trial and competence to waive the right to counsel, the court in *Sieling* held that a pretrial determination of competency is an inadequate measure of competence to plead guilty. *See* Note, "Competence to Plead Guilty: A New Standard," 1974 *Duke L.J.* 149. *But see United States ex rel. McGough v. Hewitt,* 528 F.2d 339, 342 n. 2 (3d Cir. 1975).

We have similarly recognized that the "level of awareness and comprehension" necessary for a valid waiver of constitutional rights differs from the level necessary to stand trial. *United States v. David,* 167 U.S.App.D.C. 117, 511 F.2d 355, 362 n. 19 (1975). *See In re Williams,* 165 F.Supp. 879 (D.D.C.), *order modified on other grounds, Williams v. Overholser,* 104 U.S.App.D.C. 18, 259 F.2d 175 (1958), *cert. denied, Williams v. United States,* 379 U.S. 982, 85 S.Ct. 689, 13 L.Ed.2d 572 (1965). *Cf. Rees v. Peyton,* 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966).

**31.** *Sieling v. Eyman, supra,* n. 26 at 215, *citing* Judge Hufstedler, in *Schoeller v. Dunbar,* 423 F.2d 1183, 1194 (9th Cir.), *cert. denied,* 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed.2d 66 (1970).

**32.** *Johnson v. Zerbst, supra,* n. 28, 304 U.S. at 464, 58 S.Ct. at 1023, 82 L.Ed. at 1466. *See also United States v. David, supra,* n. 30; *Naples v. United States,* 113 U.S.App.D.C. 281, 307 F.2d 618, 625 (1962).

**33.** *See, e. g., United States v. Joslin,* 140 U.S.App.D.C. 252, 434 F.2d 526 (1970); *United States v. McGirr,* 434 F.2d 844 (4th Cir. 1970); *Gearhart v. United States,* 106 U.S.App.D.C. 270, 272 F.2d 499 (1959); *United States v. Holland,* 170 F.Supp. 83 (D.D.C.1959).

**34.** *See, e. g., Sanders v. United States,* 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963); *Rose v. United States,* 513 F.2d 1251 (8th Cir. 1975); *Floyd v. United States,* 365 F.2d 368 (5th Cir. 1966), and cases cited therein at 376–7; *Nelms v. United States,* 318 F.2d 150 (4th Cir. 1963), and cases cited therein at 153; *Smith v. United States,* 106 U.S.App.D.C. 169, 270 F.2d 921 (1959) (en banc). *See generally,* Brakel and Rock, *The Mentally Disabled and the Law,* p. 420 (1971 ed.); Swadron, "Collateral Attack of Federal Convictions on the Ground of Mental Incompetency," 39 *Temple L.Q.* 117 (1966); Orfield, Criminal Procedure under the Federal Rules § 11.26 (1966).

**35.** 28 U.S.C. § 2255.

Of course, "[a] petitioner is not automatically entitled to a hearing on his mental incompetency. He must set forth sufficient facts in his petition from which the court can properly determine that there is a need for a hearing." *Bruce v. Estelle,* 483 F.2d 1031, 1037, n. 16 (5th Cir. 1973). But it has been said that "[o]rdinarily the question of mental competency to stand trial is not one which comes within the excusatory provision of 28 U.S.C. § 2255, making unnecessary a hearing . . . ." *Nelms v. United States, supra,* n. 34 at 154.

**36.** The district court here noted that

Since [it] has somewhat more latitude to permit withdrawal under Rule 32(d), it will view the Motion in the light most favorable to the defendant and consider the post-conviction motions, motions under Rule 32(d). 8A Moore's ¶ 32.07(4).

Memorandum Order, May 9, 1974, p. 1.

Unlike 28 U.S.C. § 2255, Rule 32(d) has no express "hearing" provision, but "the same standard for ordering a hearing appears to be appropriate." 8A Moore's Federal Practice § 32.07[4] (1975).

based on: (1) appellant's failure to raise the competence issue prior to sentencing; (2) its personal observation of appellant and the apparent understanding appellant displayed, as evidenced by his affirmative responses, during the guilty plea colloquy; and (3) appellant's admissions of his role in the robbery. These grounds, of course, do not support the denial of relief without a hearing.

(1) The district court repeatedly emphasized that "[a]ll the factors . . . raised as bases for withdrawal were known prior to sentencing." [37] The court observed that "[i]f the defendant's lack of capacity was a truly serious claim, it certainly was apparent prior to sentencing, and would have been raised at that time." [38] This proposition reflects both a misapplication of the law, and a "basic failure of our criminal justice system to recognize that special provisions must sometimes be made for the mentally retarded." [39]

Rule 32(d) specifically provides for withdrawal of a plea *after* both conviction and sentencing. [40] There is no time limitation for the filing of a 28 U.S.C. § 2255 motion. [41] The Supreme Court has recognized that the failure to raise the competen-

cy issue prior to conviction is no bar to relief since "it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial." [42]

Although there were early signs suggesting retardation, [43] appellant was first tested *after* entry of his plea. Counsel informed the court that only upon learning appellant's IQ did he appreciate the import of those earlier signs and realize that appellant might have been incompetent. [44] Counsel argued that

> he was misled by defendant's attitude and manner into believing that defendant understood the proceedings and the consequences of his plea of guilty. Defendant appeared to be agreeable to all suggestions, *nodding* to counsel as though he understood counsel's explanation. [45] (Emphasis added.)

Counsel's initial failure to recognize appellant's retardation and appellant's apparent acquiescence must be examined in the light of available research. For example, studies could be introduced at a proper hearing, subject to examination and cross-examination, indicating that the mentally retarded often demonstrate an exaggerated

---

**37.** Memorandum Order, May 9, 1974, p. 4.

**38.** *Id.*

**39.** Brief of *Amicus Curiae*, pp. 6–7 (footnote omitted). The position of the *Amicus* is *not* that the retarded may never be subjected to the criminal laws, for this would be "antithetical to professional efforts to 'normalize' the treatment of the retarded, and to grant them full citizenship. *See, e. g.,* Kugel & Wolfensberger, Changing Patterns in Residential Services for the Mentally Retarded (President's Committee on Mental Retardation, 1969); National Association of Retarded Citizens, Policy Statement on Residential Care (1969)." *Id.* at 7. Rather, the point is that "a retarded individual frequently requires the good offices and efforts of nonretarded citizens in order to have his or her welfare safeguarded," American Association on Mental Deficiency, Position Papers, *Rights of Mentally Retarded Persons*, p. 3 (1975), and that this may be especially true to ensure the preservation of complex constitutional rights with which even the most sophisticated layperson may be unfamiliar.

**40.** "[T]o correct manifest injustice the court after sentence may set aside the judgment of conviction and permit the defendant to withdraw his plea." F.R.Crim.P. 32(d), 18 U.S.C.

**41.** "A motion for such relief may be made at any time." 28 U.S.C. § 2255. *See, e. g., Bishop v. United States, supra,* n. 24 (§ 2255 available to challenge 17-year-old conviction); *Bostic v. United States,* 112 U.S.App.D.C. 17, 298 F.2d 678 (1961) (24-year-old conviction). *See also United States v. Collier,* 399 F.2d 705 (7th Cir. 1968).

**42.** *Pate v. Robinson, supra,* n. 24, 383 U.S. at 384, 86 S.Ct. at 841, 15 L.Ed.2d at 821. *See also, Bruce v. Estelle, supra,* n. 35; *Floyd v. United States, supra,* n. 34.

**43.** *Supra,* pp. 722–724.

**44.** *See,* Motion to Vacate Plea of Guilty under 28 U.S.C. § 2255, April 12, 1974, p. 1.

**45.** Brief of Appellant, pp. 12–13.

suggestibility and need to cooperate,[46] and that retardation frequently goes undetected.[47]

■ (2) Nor can the court's reliance on its personal observations of appellant be determinative.[48] Decisions of the Supreme Court[49] and the various courts of appeals[50] clearly indicate that the trial court's observation of a defendant's apparent rationality and comprehension is an insufficient basis

46. It has been suggested, for example, that the retarded may confess guilt just to please others. *See, Col.Hum.Rights L.Rev., supra,* n. 23 at 254; Floyd, *The Mentally Retarded Public Offender and the Law,* p. 18 (1968); President's Committee on Mental Retardation, *Report of the Task Force on Law,* p. 33 (1963). *See also, Commonwealth v. Daniels,* 321 N.E.2d 822, 827 (Mass.1975).

The results of a 3-year empirical study of the operation of civil and criminal laws affecting the retarded, conducted by the Institute of Law, Psychiatry and Criminology, are reported in Allen, "The Retarded Offender: Unrecognized in Court and Untreated in Prison," 32 *Fed.Prob.* 22 (1968). In the criminal law-correctional phase of the study, six adult correctional institutions housing inmates with IQ's below 70 were canvassed. Responses demonstrated that "a confession had been obtained from every retardate in [the] sample who did not plead guilty, except one." *Id.* at 26. And while "virtually all of them were represented by counsel . . . in only three cases was admissibility of the confession objected to at trial." *Id.*

47. As one commentator observed, research indicates "failure to recognize [retardation and] insensitivity or indifference to it" often account for the fact that a defendant's mental retardation ordinarily is not disclosed at or prior to trial. Allen, 32 *Fed.Prob.* 22, *supra,* n. 46 at 25. See also Talent and Kelgord, "The Mentally Retarded Probationer," 39 *Fed.Prob.* 39 (1975).

For a particularly revealing illustration of the way retardation goes undetected in the criminal process *see,* Haggerty, Kane and Udall, "An Essay on the Legal Rights of the Mentally Retarded," 6 *Family L.Q.* 59 (1972). The authors conclude:

Where the defendant in a criminal case is retarded, this fact is rarely learned. One of the most pressing problems of the mentally retarded is that by default, as it were, their legal rights are often ignored, disregarded, or simply violated. . . . Generally speaking, most lawyers are unfamiliar with the legal rights of the mentally retarded. As a result, the mentally retarded do not have the protection of those rights.

*Id.* at 60.

for denying a hearing on a § 2255 motion raising the issue of competency. The impropriety of reliance on personal observation is highlighted in the case of a retarded defendant.

■ And although the district court addressed appellant before accepting his plea, it is apparent that the standard Rule 11[51] colloquy may prove an inadequate measure of the validity of a plea proffered by a

There are great differences in the degree of intellectual functioning and adaptive ability among the mentally regarded. See Cytryn and Lourie, "Mental Retardation," in *Comprehensive Textbook of Psychiatry II* (Freedman, Kaplan and Sadock, Eds. 1975). This extreme heterogeneity within the class of those considered retarded may contribute to the difficulty the average citizen has in recognizing another's mental retardation. Most mildly retarded persons appear to others to be "normal," though "slower" in thinking, speaking and moving. *See,* Giagiari, "The Mentally Retarded Offender," 3 *Crime & Delinq.Lit.* 339, 561–2 (1971).

48. The court noted that it had "personally observed and questioned the defendant and is of the opinion, all other factors considered, that the defendant entered a voluntary and knowledgeable plea." Memorandum Order of May 9, 1974, pp. 3–4.

49. *See Pate v. Robinson, supra,* n. 24, 383 U.S. at 386, 86 S.Ct. at 842, 15 L.Ed.2d at 822 ("While [respondent's] demeanor at trial might be relevant to the ultimate decision as to his sanity, it cannot be relied upon to dispense with a hearing on that very issue."); *Sanders v. United States, supra,* n. 34, 373 U.S. at 19–20, 83 S.Ct. at 1079, 10 L.Ed.2d at 164 ("However regular the proceedings at which [he] signed a waiver of indictment, declined assistance of counsel, and pleaded guilty might appear from the transcript, it still might be the case that petitioner did not make an intelligent and understanding waiver . . . . That the judge may have thought that he acted with intelligence and understanding in responding to the judge's inquiries cannot 'conclusively show,' as the statute requires, that there is no merit in his present claim."). *Cf., Machibroda v. United States, supra,* n. 26.

50. *See, e. g., United States v. Collier, supra,* n. 41; *Hansford v. United States, supra,* n. 25; *Floyd v. United States, supra,* n. 34; *Bostic v. United States, supra,* n. 41; *Taylor v. United States,* 282 F.2d 16 (8th Cir. 1960); *Smith v. United States,* 267 F.2d 210 (9th Cir. 1959).

51. *Supra,* n. 7.

defendant of questionable mental competence. As the Supreme Court observed, "[t]he nature of the inquiry required by Rule 11 must necessarily vary from case to case . . .. In all such inquiries, '[m]atters of reality, and not mere ritual, should be controlling.' "[52]

(3) Finally, appellant's guilt or innocence is not a proper basis for dispensing with an evidentiary hearing.[53] While under Rule 32(d) "a failure to demonstrate innocence, or an admission of guilt, has ordinarily been considered fatal,[54] relief may be accorded under 28 U.S.C. § 2255 regardless of petitioner's guilt or innocence.[55]

It may be argued that we should order withdrawal of appellant's plea on the ground that the district court abused its discretion in failing to do so. But we believe that the interests of the appellant and the administration of criminal justice would best be served by a hearing to properly examine and assess the nature and extent of appellant's disabilities. Such information is essential whether the issue is competency to stand trial, withdrawal of a plea, criminal responsibility or sentencing.[56] Only with the light of such information can we hope to find the path to accommodating society's need for order with its deeply-held

52. *McCarthy v. United States, supra,* n. 27, 394 U.S. at 468–9, n. 20, 89 S.Ct. at 1171, 22 L.Ed.2d at 426, citing *Kennedy v. United States,* 397 F.2d 16, 17 (6th Cir.), *cert. denied,* 394 U.S. 1018, 89 S.Ct. 1636, 23 L.Ed.2d 43 (1969). *Accord, Sieling v. Eyman, supra,* n. 26. *Cf., Sanders v. United States, supra,* n. 34; *Von Moltke v. Gillies,* 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309 (1948); *United States v. David, supra,* n. 30.

53. The district court expressed concern over the fact that appellant "told no less than five people of his role in the robbery . . . [and] admitted he was the one with the gun . . . ." Memorandum Order of May 9, 1974, p. 3.

54. *Moore's Federal Practice, supra,* n. 36, § 32.-07(4). *See Watts v. United States,* 107 U.S. App.D.C. 367, 278 F.2d 247, 251 (1960). *But see* American Bar Association Project on Minimum Standards for Criminal Justice, Standards Relating to Pleas of Guilty, § 2.1(a)(iii) (App. Draft 1967) ("The defendant may move for withdrawal of his plea without alleging that he is innocent of the charge to which the plea has been entered.").

55. *Moore's Federal Practice, supra,* n. 36, § 32.-07(4).

56. Trial judges are accorded wide latitude in exercising discretion in determining sentences. *United States v. McCoy,* 139 U.S.App.D.C. 60, 429 F.2d 739, 743 (1970). This is considered appropriate because the judge "will have heard the evidence at trial, observed the demeanor of the defendant, absorbed the information in the presentence report, and heard any further personal information or assurances offered by the defendant's allocution," *id.,* and because "it alone can command 'the fullest information possible concerning the defendant's life and characteristics.' " *Bennings v. United States,*

120 U.S.App.D.C. 1, 343 F.2d 283, 284 (1964) (dissenting opinion), citing *Williams v. New York,* 337 U.S. 241, 247, 69 S.Ct. 1079, 1083, 93 L.Ed. 1337, 1342, *reh. denied,* 337 U.S. 961, 69 S.Ct. 1529, 93 L.Ed. 1760; 338 U.S. 841, 70 S.Ct. 34, 94 L.Ed. 514 (1949).

Congress has provided various resources to assist the court in gathering such information—*e. g.,* a presentence report, examination under 24 D.C.Code § 301 and appointment of a psychiatrist and psychologist under 24 D.C. Code § 106. *See Leach v. United States,* 115 U.S.App.D.C. 351, 320 F.2d 670, *after remand,* 118 U.S.App.D.C. 197, 334 F.2d 945 (1964).

An awareness of the availability and efficacy of various sentencing alternatives for the retarded offender is also essential. There is evidence, for example, indicating that while prisons provide few, if any, meaningful programs or services for the retarded, *see* Brown and Courtless, "The Mentally Retarded in Penal and Correctional Institutions," 124 *Amer. J. Psychiatry* 1164, 1166 (1968), nearly 10% of our prison population is retarded, contrasted with a 3% incidence of retardation in the general population. *Id.* In some geographic areas, the retarded reportedly comprise more than 24% of the prison population. Dennis, "Tennessee's Research and Demonstration Project on the Retarded Juvenile Offender," *The Naive Offender Format and Essays* (New England Seminar on Retarded Youth and the Law Enforcement Process 1971), cited in Talent and Kelgord, *supra,* n. 47 at 39. This may be due to the fact that the retarded individual "is more easily apprehended, more prone to confess, more likely to be convicted, and . . . incarcerated longer than the nonretarded offender." Allen, 32 Fed.Prob., *supra,* n. 46 at 25. Research also indicates that the retarded are particularly vulnerable to victimization by brighter peers. *See,* Blackhurst, "Mental Retardation and Delinquency," 2 *J. Special Education* 379 (1968).

concern for the dignity and worth of every human being.

*Reversed and Remanded.*

HASTIE, Circuit Judge (concurring):

Joining in Chief Judge Bazelon's opinion, I add this concurring comment only because the dissenting opinion—erroneously, in my view—pictures this decision as a jurisprudential sport that "licenses every illiterate moron to violate the law with impunity." In actuality this decision merely recognizes and implements the fundamental and firmly established rule that "if a defendant's guilty plea is not equally voluntary and knowing, it has been obtained in violation of due process and is therefore void." *See McCarthy v. United States*, 394 U.S. 459, 466, 89 S.Ct. 1166, 1171, 22 L.Ed.2d 418, 425 (1968).

By proper post-conviction procedure in the trial court, appellant Masthers put in issue the question whether his guilty plea had been "voluntary and knowing." And on that issue he asked for an evidentiary hearing.

The district court denied an evidentiary hearing and found the plea valid on the basis of the original showing that had been made in open court before acceptance of the plea. Thus the issue here is simply whether the district court should have permitted the appellant to establish, if he could, in this post-conviction proceeding that his plea was not, as it had seemed at arraignment, voluntary and knowing.

As Chief Judge Bazelon points out, data before us on this appeal, but not before the district court at arraignment, strongly indicates that Masthers' level of intelligence is so low and his mental retardation so great that all that was said and done on the occasion of his pleading did not irrebuttably establish comprehension of the relevant circumstances and a meaningful election to plead guilty. The dissenting opinion seems to reason that, since it is not contended that Masthers was legally "insane", his capacity to understand an ordinary explanation and then make a voluntary and knowing election must be measured by the standard of normal intelligence. This is our point of disagreement.

We make special effort and provisions to the end that the deaf litigant or the litigant whose comprehension of the English language is poor shall understand what is transpiring in court and act knowingly. It seems neither fair nor humane to refuse to make an analogous appropriate special effort when it appears that an accused person's comprehension is substantially impaired because of mental retardation.

In these circumstances it is our proper and constant concern for fair procedure, not any doctrinal aberration, that dictates an evidentiary hearing to determine, in the light of all that is now known about Masthers' mentality, whether his plea was voluntary and knowing. If it was, that would end the matter. On the other hand, if he should be permitted to withdraw his plea, it should not be too difficult to find someone skilled in working and communicating with the mentally retarded who could and would communicate effectively with him, so that his participation in any further proceedings would be knowing and meaningful.

ROBB, Circuit Judge (dissenting):

From the premise that the defendant Masthers was a man of limited intelligence and education the majority extracts the conclusion that he may have been incompetent to enter a plea of guilty, so that a hearing is necessary to determine his competency. I cannot agree. In my opinion there is nothing in the record to support the inference that Masthers was incompetent or that he did not know exactly what he was doing when he entered his plea.

Indicted with a co-defendant for armed robbery and released on personal recognizance June 2, 1972 the defendant failed to appear for arraignment on June 16, 1972. He was a fugitive from that date until October 3, 1973 when he was arrested on a bench warrant. Meanwhile the co-defendant, who had implicated Masthers, pleaded guilty and was sentenced.

On November 26, 1973 Masthers entered the plea of guilty which is in question here. He was committed pursuant to 18 U.S.C. § 4253, the Narcotic Addict Rehabilitation Act, to determine whether he was an addict and likely to be rehabilitated under the NARA program. The NARA staff reported that his addiction was questionable and that he was not likely to be rehabilitated through the NARA program. The report noted that he was "not functioning at an educational, mental or social level of the average person referred to this program", his I.Q. score being 57 "which would place him in the 'mentally defective' category". An achievement test indicated he was "operating slightly above the second grade level of academic achievement". Having received this report, together with a presentence report from the probation officer, the District Court on March 28, 1974 sentenced Masthers to be imprisoned for not less than two nor more than six years.

On April 12, 1974 Masthers, through his counsel, filed a "Motion to Vacate Plea of Guilty under 28 United States Code 2255"; and on May 6, 1974 he filed a Motion for Withdrawal of Plea of Guilty under 32(d) Fed.R.Crim.P. The ground of both motions was that subsequent to the plea of guilty counsel became aware of evidence in the reports on the defendant that he had a subnormal I.Q. and was incompetent to stand trial or plead guilty. On May 6, 1974 counsel also filed a Motion for Reconsideration and Reduction of the Sentence imposed upon Masthers. The District Court considered the motions together and by memorandum order denied them without hearing. I think the court was right.

This is not a case in which an innocent man because of ignorance, stupidity or overreaching has pleaded guilty to a crime he did not commit. The record discloses that the complaining witness, who was held up at gunpoint, knew Masthers and was therefore able to identify him without difficulty. Masthers freely confessed his guilt to the police, the probation officer and the NARA staff. In his motion to vacate the plea his counsel asserted that Masthers

"continually stated that in fact he had committed the offense in question. Additionally, the government witnesses were interviewed prior to the plea of guilty by counsel, and their testimony was definite that the defendant did the act complained of and the defendant stated that the confession was not coerced." When he entered his plea of guilty his counsel told the court that he had explained the matter to Masthers who was "doing this of his own free will". In response to questions from the court Masthers acknowledged that he understood his rights, understood the charge against him, which the court explained, and that the government's oral statement of the facts of the case was accurate. Although the majority thinks it significant that Masthers answered only "Yes Ma'am" to the various questions from the bench I fail to see what more needed to be said; there was no occasion for a speech. Finally, at the time of sentencing Masthers told the court:

> I know I have did some bad things, but I haven't did nothing like this before in my life, but like Mr. Lowy [his counsel] said I don't have much education, and everybody knows that.

The majority suggests that in this case "matters of reality . . . should be controlling". I agree. I think the realities in this case are that the defendant understood that he was charged with the armed robbery of the complaining witness, knew he was guilty, and understood that his plea of guilty would subject him to punishment. Any other conclusion from the facts would, I submit, be a masterpiece of naivete.

Since the defendant understood what he was doing the question comes to this: May a guilty man who freely and with the advice of counsel acknowledges his guilt by a plea of guilty avoid the consequences of his plea upon the ground that he is an uneducated dullard? I think the answer must be no.

Until today the law of this circuit has been that evidence of a low intelligence quotient rating is not evidence of a mental defect and certainly does not demonstrate

incompetency; and we have never accepted the theory of diminished responsibility. *McDonald v. United States*, 114 U.S.App. D.C. 120, 123, 312 F.2d 847, 850 (1962) *en banc*; *Stewart v. United States*, 107 U.S. App.D.C. 159, 165, 275 F.2d 617, 623 (1960) *en banc, rev'd on other grounds*, 366 U.S. 1, 81 S.Ct. 941, 6 L.Ed.2d 84 (1961). The majority abandons these sound doctrines; for if the defendant's low intelligence and meager education make him incompetent to plead guilty then perforce he is incompetent to stand trial, and if he should be tried he could successfully raise the defense of incompetence. Thus the majority creates for this circuit a new defense against charges of crime—a lack of responsibility not amounting to insanity. The decision licenses every illiterate moron to violate the law with impunity. I cannot accept such a doctrine. Accordingly I dissent.

### On Sua Sponte Motion for Rehearing En Banc

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.

### ORDER

PER CURIAM.

The motion for rehearing *en banc* initiated by a member of the Court in regular active service is denied, a majority of the Circuit Judges who are in regular active service not having voted in favor of it (Rule 35, Federal Rules of Appellate Procedure).

*Statement of Circuit Judge ROBB of reasons for voting for rehearing en banc. Circuit Judges TAMM, MacKINNON and WILKEY concur in this statement.*

### Statement of Circuit Judge ROBB of Reasons for Voting for Rehearing *En Banc*

I have voted in favor of the suggestion by one of my colleagues that this case be reheard *en banc*. In my judgment the majority opinion is an attempt to introduce the defense of diminished responsibility into the criminal law of this circuit. We rejected

that concept in *Stewart v. United States*, 107 U.S.App.D.C. 159, 165, 275 F.2d 617, 623 (1960), *en banc*, (opinion by Burger, J.) *rev'd on other grounds*, 366 U.S. 1, 81 S.Ct. 941, 6 L.Ed.2d 84 (1961). If we are now to change the law that action should be taken by the full court, not by way of a panel opinion and its implications.