**UNITED STATES of America**

**v.**

**Daniel JACKSON, Appellant.**

**No. 76–1077.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 14, 1976.

Decided Dec. 21, 1976.

Rehearing En Banc Denied April 4, 1977.

---

Robert A. W. Boraks, Washington, D. C. (appointed by this court), for appellant.

Mary H. Weiss, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., and John A. Terry, Asst. U. S. Atty., Washington, D. C., were on the brief for appellee.

Before TAMM, MacKINNON and WIL-KEY, Circuit Judges.

Opinion for the court filed by Circuit Judge MacKINNON.

MacKINNON, Circuit Judge:

The issue raised in this appeal is whether a person found not guilty of a crime by reason of insanity, who suffers from mental retardation rather than a mental disease, is subject to indeterminate commitment to a hospital for the mentally ill under D.C.Code § 24–301(d) (1973).[1]

Appellant Daniel Jackson was indicted on July 15, 1968, and charged with first degree burglary and rape. A defense motion for a mental observation was granted on August 2, 1968,[2] by then Chief Judge Edward Curran of the district court. Appellant was

---

1. D.C.Code § 24–301(d) reads in full:

 (d)(1) If any person tried upon an indictment or information for an offense raises the defense of insanity and is acquitted solely on the ground that he was insane at the time of its commission, he shall be committed to a hospital for the mentally ill until such time as he is eligible for release pursuant to this subsection or subsection (e).

 (2) A person confined pursuant to paragraph (1) shall have a hearing, unless waived, within 50 days of his confinement to determine whether he is entitled to release from custody. At the conclusion of the criminal action referred to in paragraph (1) of this subsection, the court shall provide such person with representation by counsel—

 (A) in the case of a person who is eligible to have counsel appointed by the court, by continuing any appointment of counsel made to represent such person in the prior criminal action or by appointing new counsel; or

 (B) in the case of a person who is not eligible to have counsel appointed by the court, by assuring representation by retained counsel.

 If the hearing is not waived, the court shall cause notice of the hearing to be served upon the person, his counsel, and the prosecuting attorney and hold the hearing. Within ten days from the date the hearing was begun, the court shall determine the issues and make findings of fact and conclusions of law with respect thereto. The person confined shall have the burden of proof. If the court finds by a preponderance of the evidence that the person confined is entitled to his release from custody, either conditional or unconditional, the court shall enter such order as may appear appropriate.

 (3) An appeal may be taken from an order entered under paragraph (2) to the court having jurisdiction to review final judgments of the court entering the order.

2. The motion stated as grounds for the request that appellant had previously been a patient at

committed to Saint Elizabeths Hospital for 60 days for a psychiatric examination, and on November 5, 1968, the acting superintendent of the hospital reported to the court that Jackson was "suffering from Mild Mental Retardation (IQ 55)"[3] and that he "experienced this condition at the time of the alleged criminal offense . . . and there is a causal connection between these offenses and his condition of mental retardation." The hospital concluded, however, that Jackson was competent to stand trial, and the court issued an order to this effect on November 21, 1968.

On March 3, 1969, in a trial before the court, Jackson was found not guilty by reason of insanity and committed for thirty days to Saint Elizabeths for a mental examination in accordance with D.C.Code § 24–301(d). The hospital reported on March 5, 1969, that

> Saint Elizabeths for eight years, and that his appearance and statements suggested the possibility of brain damage at birth. Appellee br. 4.

**3.** Appellant's IQ places him within the category of "mild" mental retardation under both of the two major systems for classifying degrees of severity of mental retardation in terms of IQ. *See United States v. Masthers*, 176 U.S.App. D.C. 242, 245 n. 16, 539 F.2d 721, 724 n. 16 (1976).

**4.** D.C.Code § 24–301(e) (1973) provides for unconditional release as follows:

> (e) Where any person has been confined in a hospital for the mentally ill pursuant to subsection (d) of this section, and the superintendent of such hospital certifies (1) that such person has recovered his sanity, (2) that, in the opinion of the superintendent, such person will not in the reasonable future be dangerous to himself or others, and (3) in the opinion of the superintendent, the person is entitled to his unconditional release from the hospital, and such certificate is filed with the clerk of the court in which the person was tried, and a copy thereof served on the United States Attorney or the Corporation Counsel of the District of Columbia, whichever office prosecuted the accused, such certificate shall be sufficient to authorize the court to order the unconditional release of the person so confined from further hospitalization at the expiration of fifteen days from the time said certificate was filed and served as above; but the court in its discretion may,

it is the opinion of the psychiatrist that Mr. Jackson is suffering from a mental illness at this time, Mild Mental Retardation (IQ 55), With Other (And Unspecified) Condition. It is further the opinion of the psychiatrist that because of such mental illness Mr. Jackson is likely to injure himself and others if allowed to remain at liberty. In view of the above, he will require hospitalization for an indefinite period of time.

Following a hearing on March 28, 1969, Judge Curran made findings of fact in similar terms and ordered that the appellant be committed to Saint Elizabeths for an indeterminate period pursuant to D.C.Code § 24–301(d), until released in accordance with D.C.Code § 24–301(e) (1973).[4]

Subsequent to his indeterminate commitment, Appellant filed several habeas corpus petitions without success.[5] Then on No-

> or upon objection of the United States or the District of Columbia shall, after due notice, hold a hearing at which evidence as to the mental condition of the person so confined may be submitted, including the testimony of one or more psychiatrists from said hospital. The court shall weigh the evidence and, if the court finds that such person has recovered his sanity and will not in the reasonable future be dangerous to himself or others, the court shall order such person unconditionally released from further confinement in said hospital. If the court does not so find, the court shall order such person returned to said hospital. . . .

This subsection also provides for conditional release in similar terms.

**5.** Jackson filed four habeas corpus petitions in the district court prior to the present motion for unconditional release: H.C. Nos. 69–70, 197–70, 85–71, and 88–72. Three of these resulted in appeals to this court, and one in a published opinion: *Jackson v. Jacobs*, No. 23759, remanded November 2, 1971; *Jackson v. Robinson*, No. 71–1129, withdrawn by leave of court, November 12, 1971; *Jackson v. Robinson*, No. 71–1950, 155 U.S.App.D.C. 94, 476 F.2d 539 (1973) (permitting appellant to withdraw by leave of court).

Appellees refer in their brief to the transcripts of the hearings before the district court on three of these habeas corpus petitions. Appellant argues that since these transcripts were not formally made a part of the record before the district court in the present proceeding, this court is precluded by F.R.App.P. 10(a) from relying upon them in this appeal. We need not

vember 29, 1972, Dr. Luther Robinson, the Superintendent of the hospital, wrote to the district court recommending that Jackson be allowed to visit at home with his mother on Christmas, stating that Jackson had "sufficiently improved so as not to be dangerous to himself or others during these limited periods." This request was denied on December 11 by Judge Hart. However, on January 30, 1973, Dr. Robinson again wrote to the court in support of a request that Jackson be conditionally released on weekends and holidays, in the discretion of the hospital, to visit with his family. Judge Gasch issued an order to this effect on February 8, 1973.

On October 29, 1975, Jackson, by counsel appointed from the public defender service, filed a motion for unconditional release pursuant to D.C.Code § 24–301(e) and (k) (1973).[6] In support of the motion, appellant argued that § 24–301(d) and the relevant case law required the release of a person acquitted of a crime on the ground of insanity when that person was not mentally ill and dangerous, and that since the appellant was retarded rather than mentally ill he could not, as a matter of law, be committed for an indeterminate period under that section.[7] The Government opposed the motion, contending that mental retardation is a mental illness for which the appellant may be committed under § 24–301(d). At a

hearing held before Judge Gasch on January 13, 1976, the parties agreed that there was no question as to the fact of the appellant's continuing mental retardation, (Tr. 10). Judge Gasch denied the motion without comment (Tr. 19), and this appeal was taken.

On appeal, appellant argues that the district court's construction of § 24–301(d) is unsupported by the case law or legislative history, and that construction of the section to permit the indeterminate commitment of acquitted defendants suffering from mental defects rather than mental diseases would render the section constitutionally infirm on several grounds. We affirm the order of the district court.

## I.

The parties do not contest the validity of appellant's acquittal by reason of insanity. Under the Model Penal Code definition of insanity, adopted by this court in *United States v. Brawner,* 153 U.S.App.D.C. 1, 471 F.2d 969 (1972) (en banc), as under the earlier test adopted in *Durham v. United States,* 94 U.S.App.D.C. 228, 214 F.2d 862 (1954), an insanity defense may be based either on a mental disease or on a mental defect, provided there is a sufficient causal link between the defendant's mental disease or defect and his inability to control his behavior.[8] It is accepted in this jurisdiction

---

reach this issue, since our disposition of this case does not depend upon information found only in the disputed transcripts.

**6.** D.C.Code § 24–301(e) is set out in relevant part in note 3 *supra.* D.C.Code § 24–301(k) provides in part:

(k)(1) A person in custody or conditionally released from custody, pursuant to the provisions of this section, claiming the right to be released from custody, the right to any change in the conditions of his release, or other relief concerning his custody, may move the court having jurisdiction to order his release, to release him from custody, to change the conditions of his release, or to grant other relief.

(2) A motion for relief may be made at any time after a hearing has been held or waived pursuant to subsection (d)(2) of this section.

(3) Unless the motion and the files and records of the case conclusively show that the person is entitled to no relief, the court

shall cause notice thereof to be served upon the prosecuting authority, grant a prompt hearing thereon, determine the issues, and make findings of fact and conclusions of law with respect thereto. On all issues raised by his motion, the person shall have the burden of proof. If the court finds by a preponderance of the evidence that the person is entitled to his release from custody, either conditional or unconditional, a change in the conditions of his release, or other relief, the court shall enter such order as may appear appropriate.

**7.** In the alternative, Jackson argued that he was entitled to a jury trial on the matter of mental illness and dangerousness. This issue was not raised on appeal.

**8.** In *Durham, supra,* 94 U.S.App.D.C. at 241, 214 F.2d at 875, the court stated that:

We use "disease" in the sense of a condition which is considered capable of either

that mental retardation is a mental defect that will support an insanity defense. *See McDonald v. United States,* 114 U.S.App. D.C. 120, 122, 312 F.2d 847, 849 (1962) (en banc); *United States v. Shorter,* 343 A.2d 569 (D.C.App.1975); *cf. United States v. Masthers,* 176 U.S.App.D.C. 242, 539 F.2d 721 (1976).

█ Neither does appellant contest the validity of his initial post-acquittal commitment to Saint Elizabeths Hospital, without a hearing, for evaluation of his mental condition.[9] This initial commitment is required by D.C.Code § 24–301(d)(1) for *"any person . . . [who] raises the defense of insanity and is acquitted solely on [that] ground"* (emphasis added). Appellant does, however, contend that the March 28, 1969, commitment order was improper because § 24–301(d)(2) does not permit the indeterminate commitment of persons not suffering from a "mental disease."

Appellant bases his argument in part upon a reading of § 24–301(d) together with the code sections providing for civil commitment of persons suffering from mental dis-

eases and retardation. Separate civil commitment statutes and treatment facilities are provided for these two classes. *Compare* the 1964 District of Columbia Hospitalization of the Mentally Ill Act, D.C.Code §§ 21–501 to 21–592 (1973), *with* D.C.Code §§ 21–1101 to 21–1123 (1973). "[M]ental illness" is defined in § 21–501 as "a psychosis or other disease which substantially impairs the mental health of a person," while § 21–1101 defines a "substantially retarded person" as a mentally defective person who requires care for his own welfare and the welfare of others "and who is not insane nor of unsound mind to such an extent as to require his commitment to a hospital for the mentally ill." Substantially retarded individuals who are "not insane nor of unsound mind" are committed to Forest Haven, D.C.Code §§ 21–1101, 32–601, 32–602 (1973), while mentally ill persons are generally committed to Saint Elizabeths.[10] A "substantially retarded person" who has been civilly committed to Forest Haven and then becomes "insane" can be transferred to Saint Elizabeths under D.C.Code § 21–1116 (1973).[11]

---

improving or deteriorating. We use "defect" in the sense of a condition which is not considered capable of either improving or deteriorating and which may be either congenital, or the result of injury, or the residual effect of a physical or mental disease.

In *McDonald v. United States,* 114 U.S.App. D.C. 120, 124, 312 F.2d 847, 851 (1962), the court adopted a more general definition, noting that

[i]n *Durham,* rather than define either term, we simply sought to distinguish disease from defect. Our purpose now is to make it very clear that neither the court nor the jury is bound by *ad hoc* definitions or conclusions as to what experts state is a disease or defect. . . . [F]or the jury's purpose in determining criminal responsibility[,]. . . . the jury should be told that a mental disease or defect includes any abnormal condition of the mind which substantially affects mental or emotional processes and substantially impairs behavior controls.

The court in *Brawner, supra,* 153 U.S.App.D.C. at 15–16, 471 F.2d at 983–84, retained the *McDonald* definition for the purpose of the Model Penal Code Test.

*Brawner* carries forward the causality requirement of *Durham,* but requires as well that the defendant show that his behavior controls were impaired to such an extent that he

"lack[ed] substantial capacity to appreciate that his conduct [was] wrongful" or that he "lack[ed] substantial capacity to conform his conduct to the law." 153 U.S.App.D.C. at 23, 471 F.2d at 991.

9. Short-term commitment without a hearing for evaluation of mental condition is constitutionally permissible. *Bolton v. Harris,* 130 U.S. App.D.C. 1, 10, 395 F.2d 642, 651 (1968); *Ragsdale v. Overholser,* 108 U.S.App.D.C. 308, 313, 281 F.2d 943, 948 (1960). In *Bolton,* however, this court construed § 24–301(d) then in force to require a hearing before indeterminate commitment on the ground that the procedure otherwise would be constitutionally suspect. The section was amended in 1970 to provide for such a hearing. Pub.L.No.91–358, § 207, 84 Stat. 601 (July 29, 1970).

10. Saint Elizabeths Hospital is defined by 24 U.S.C. § 161 as "a Government Hospital for the insane . . . of the District of Columbia." "Insane" in this context is apparently assumed to include "mentally ill" persons. *See, e. g., In re Alexander,* 125 U.S.App.D.C. 352, 372 F.2d 925 (1967).

11. There is, however, no provision for a transfer in the opposite direction, *i. e.,* of a retarded inmate of Saint Elizabeths who recovers his sanity.

There is no evidence, however, that Congress intended to interrelate these provisions with § 24–301. On the contrary, there are strong indications that separate statutory schemes have been created for civil and criminal commitment. Sections 21–501 to 21–592 do not concern criminally committed individuals: § 21–501 states that for the purpose of those sections " 'mentally ill person' means a person who has a mental illness, but does not include a person committed . . . by order of the court in a criminal proceeding." Section 24–301(d)(1) by its own terms controls the initial commitment of "any person . . . [who] raises the defense of insanity and is acquitted" of a crime on that ground, and § 24–301(d)(2) governs the release or indeterminate commitment of "[a] person confined pursuant to paragraph (1) . . . ." While § 21–1116 provides for the transfer of civilly committed retarded persons who become "insane" to Saint Elizabeths, there is no provision for the commitment or transfer of persons acquitted by reason of insanity to Forest Haven.

 The legislative history of the 1970 amendments to § 21–1101 reveals no intent to interrelate the civil commitment provisions with the criminal commitment provisions of § 24–301(d).[12] Neither does the legislative history of the latter provision reveal any such intent. The principal intent of the drafters of § 24–301(d) appears to have been to insure that persons acquitted of a crime by reason of insanity are automatically committed for the protection of the public and their own protection and rehabilitation. This provision was added by Pub.L.No.313, 69 Stat. 610 (Aug. 9, 1955). The prior provision made commitment discretionary with the trial judge, D.C.Code § 24–301(d) (1951), and the Senate Committee on the District of Columbia explained the need for the new provision:

The Committee believes that a mandatory commitment statute would add much to the public's peace of mind, and to the public safety, without impairing the rights of the accused. Where accused has pleaded insanity as a defense to a crime, and the jury has found that the defendant was, in fact, insane at the time the crime was committed, it is just and reasonable in the Committee's opinion that the insanity, once established, should be presumed to continue and that the accused should automatically be confined for treatment until it can be shown that he has recovered.

S.Rep.No.1170, 84th Cong., 1st Sess. 13 (1955). This rationale suggests that it was intended that *all* defendants acquitted by reason of insanity should be distinguished from all other persons, including persons civilly committed for mental diseases or retardation. An even stronger indication of such intent appears in the legislative history of the 1970 amendments to the section, Pub.L.No.91–358, § 207, 84 Stat. 601 (July 29, 1970). The amendments were enacted to conform with the requirements established by this court in *Bolton v. Harris,* 130 U.S.App.D.C. 1, 395 F.2d 642 (1968). As the House Report explained:

Recognizing the dual purpose of [D.C. Code § 24–301(d)] (1) to protect the public and the defendant and (2) to afford treatment in a hospital for such a defendant, the U.S. Court of Appeals for the District of Columbia upheld the constitutionality of this mandatory commitment of a defendant acquitted on grounds of insanity until such time as he was found recovered

12. However, a relationship between §§ 21–1101 to 21–1123 and §§ 21–501 to 21–592 is disclosed. A proposed definition of mental illness for § 21–1101 had excluded mental deficiency; however, the House Report explained the version that was enacted:

This section differs from the original bill which had excluded epilepsy, alcoholism, drug addiction, or mental deficiency from the definition of "mental illness." Witnesses testified that these symptoms often accompany

mental illness and that persons who are mentally ill and have one or more of these conditions should not be excluded because of such a condition.

H.R.Rep.No.1883, 88th Cong., 2d Sess. 8 (1964).

Congress thus not only expressed no intent to interrelate the civil and criminal commitment provisions of the D.C.Code, but expressed an awareness that mental retardation and mental illness or disease are not mutually exclusive conditions.

**116**

by the hospital or he established the fact of his recovery in court by a petition for writ of habeas corpus. *Ragsdale v. Overholser* [108 U.S.App.D.C. 308], 281 F.2d 943 (1960); *Overholser v. O'Beirne* [112 U.S.App.D.C. 267], 302 F.2d 852 (1962).

In 1968, however, the same court, in an opinion by Judge Bazelon, in effect overruled these prior decisions and nullified the mandatory commitment which the Supreme Court recognized Congress had provided for in "plain terms" in its 1955 legislation, a commitment procedure followed in approximately twelve states (*Lynch v. Overholser,* 367 U.S. 705, 708 [82 S.Ct. 1063, 8 L.Ed.2d 211] (1962). It did so by prohibiting commitment of a defendant acquitted on grounds of insanity unless the government can prove by a preponderance of the evidence that he is presently mentally ill. *Bolton v. Harris* [130 U.S.App.D.C. 1], 395 F.2d 642.

This ruling permits dangerous criminals, particularly psychopaths, to win acquittals of serious criminal charges on grounds of insanity by raising a mere reasonable doubt as to their sanity and then to escape hospital commitment because the government is unable to prove their insanity following acquittal by a preponderance of the evidence. The result is a revolving door which, as now Chief Justice Burger explained in rejecting such an outcome in *Overholser v. O'Beirne, supra* at 861, allows defendants "to have it both ways"—to escape both conviction and commitment to a hospital.

The Committee considers this result intolerable. It neither protects the public safety nor provides treatment for a defendant acquitted of a crime on grounds of insanity.

H.R.Rep.No.91–907, 91st Cong., 2d Sess. 74 (1970).

 These reports, like the "plain terms" of § 24–301(d), indicate that it was the intent of Congress that "*any*" defendant who raises an insanity defense and is acquitted on that ground be committed to a "hospital for the mentally ill" until he satisfies his burden of proof that he is eligible for release.[13] The section on its face does not distinguish between mental disease and mental retardation as a basis for the commitment of persons acquitted by reason of insanity. The legislative history of § 24–301(d) does not indicate any intent to distinguish mental disease and mental retardation in this respect.[14]

Similarly, this court's previous decisions, of which Congress was well aware in enacting and amending the section, *see* H.R.Rep. No.91–907, 91st Cong., 2d Sess. (1970); S.Rep.No.1170, 84th Cong., 1st Sess. (1955); H.R.Rep.No.892, 84th Cong., 1st Sess. (1955), reveal that this court has not recognized such a technical distinction between mental "diseases" and mental "defects." For example, in *McDonald v. United States, supra,* the court noted that:

Evidence of a 68 I.Q. rating, standing alone without more, is not evidence of a "mental defect," thus invoking the *Durham* charge. Where, as here, other evi-

---

**13.** Section 24–301(d)(2) provides that the person committed shall have the burden of proof in seeking his release after initial automatic commitment following an acquittal by reason of insanity. This subsection is set out in note 1 *supra.* Section 24–301(k)(3) similarly provides that the movant seeking his release or change in the terms of his custody shall have the burden of proof by a preponderance of the evidence that he is entitled to such an order. *See* note 7 *supra.* In contrast, the government bears the burden of proof of insanity beyond a reasonable doubt in civil commitment proceedings, *In re Ballay,* 157 U.S.App.D.C. 59, 482 F.2d 648 (1973). The Congress has sought to avoid any constitutional problems that might be raised by the differing burden of proof, *see*

*Bolton v. Harris,* 130 U.S.App.D.C. 1, 395 F.2d 642 (1968), by limiting automatic commitment to defendants who themselves raise the defense of insanity, D.C.Code § 24–301(d)(1) (1973), and by requiring that, regardless who raises the issue, insanity be affirmatively established by a preponderance of the evidence, D.C.Code § 24–301(j) (1973). *See* H.R.Rep.No.91–907, 91st Cong., 2d Sess. 74 (1970). If any constitutional problems remain in this procedure, they are not before the court in this case.

**14.** That Congress was aware of a possible interrelationship between the two conditions has been demonstrated in a different statutory context. *See* note 13 *supra.*

dence of mental abnormality appears, in addition to the I.Q. rating, the . . . instruction should be given.

114 U.S.App.D.C. at 123, 312 F.2d at 850. But the court held that the "mental abnormality" need not be a recognized psychosis or "mental disease." Rather, the court found it sufficient that expert testimony in the case indicated that there was a causal connection between McDonald's mental defect and the impairment of his behavior controls; the issue of causation was then for the jury. The court concluded:

> In *Durham,* rather than define either term, we simply sought to distinguish disease from defect. Our purpose now is to make it very clear that neither the court nor the jury is bound by *ad hoc* definitions or conclusions as to what experts state is a disease or defect. What psychiatrists may consider a "mental disease or defect" for clinical purposes, where their concern is treatment, may or may not be the same as mental disease or defect for the jury's purpose in determining criminal responsibility. Consequently, for that purpose the jury should be told that a mental disease or defect includes *any abnormal condition of the mind which substantially affects mental or emotional processes and substantially impairs behavior controls.*

114 U.S.App.D.C. at 124, 312 F.2d at 851 (emphasis added).

Similarly, in determining whether an acquitted defendant was subject to commitment under D.C.Code § 24–301(d), this court has declined to become involved in debates concerning the precise meaning of medical terms. For example, in *Overholser v. O'Beirne,* 112 U.S.App.D.C. 267, 302 F.2d 852, 858 (1961) (Burger, J.), in holding that one termed by medical experts a "social psychopath" was subject to indeterminate commitment under § 24–301(d), the court said:

> The issue is not whether [the defendant] now has a "mental disease" but whether he has an "abnormal mental condition" which will cause him to be dangerous to himself or others if released.

112 U.S.App.D.C. at 273, 302 F.2d at 858. Analogously, in *In re Alexander,* 125 U.S. App.D.C. 352, 372 F.2d 925 (1967), the court stated that while

> it is not enough to commit a person [under the Hospitalization of the Mentally Ill Act] to find that he is mentally deficient, even when such condition is accompanied by some antisocial behavior,

Commitment to Saint Elizabeths is appropriate

> where a mentally deficient person has a danger-productive mental illness which is related to the mental deficiency and of which the deficiency may be one component.

125 U.S.App.D.C. at 354, 372 F.2d at 927. The court held that the dangerous mentally defective appellant was subject to indeterminate commitment to Saint Elizabeths even though

> the psychiatrists in this case were reluctant to label appellant's illness a psychosis, or in fact to fit it specifically into any of the various classes of mental illness recognized by the American Psychiatric Association . . . .

125 U.S.App.D.C. at 354, 372 F.2d at 927.

█ Precise medical distinctions between "mental diseases" and "mental defects" thus are made neither in the legislative history of § 24–301(d) nor in this court's prior decisions construing this and analogous sections. It is the apparent intent of Congress that when "*any* person . . . raises the defense of insanity and is acquitted solely on [that] ground," D.C.Code § 24–301(d)(1), "the insanity, once established, should be presumed to continue and . . . the accused should automatically be confined for treatment until it can be shown that he has recovered," S.Rep.No.1170, 94th Cong., 1st Sess. 13 (1955). The "plain terms" of this section should control the commitment of "*any* person" so acquitted unless there are constitutional reasons for construing it otherwise.

## II.

Appellant argues that to construe § 24–301(d)(2) to permit the indeterminate com-

mitment to a hospital for the mentally ill of mentally retarded persons who are acquitted of a crime by reason of insanity would deprive him of three constitutional rights: (1) the right to treatment, (2) the right not to be subjected to cruel and unusual punishment, and (3) the guarantee of equal protection of the law. Appellant's written and oral argument before the district court below was limited to the question of whether appellant was mentally ill within the meaning of § 24–301(d); none of these constitutional arguments was made. The district court was thus denied an opportunity to make findings of fact relating directly to these arguments. We understand appellant to be advancing these arguments only in support of the statutory construction he urges, and not as an independent attack on the validity of the statute. We therefore consider the arguments for this purpose.

### A. *Right to Treatment*

A right to treatment for mental illness was recognized by this court in *Rouse v. Cameron,* 125 U.S.App.D.C. 366, 373 F.2d 451 (1967). In that decision the court, by Chief Judge Bazelon, found that persons involuntarily committed under § 24–301 have a right to treatment based on the 1964 Hospitalization of the Mentally Ill Act, D.C. Code § 21–562, and noted that the denial of his right might have constitutional implications. This right, which was held to be cognizable in habeas corpus, 125 U.S.App. D.C. at 367, 373 F.2d at 452,

> requires the hospital to show that initial and periodic inquiries are made into the needs and conditions of the patient with a view to providing suitable treatment for

him, and that the program provided is suited to his particular needs.

125 U.S.App.D.C. at 371, 373 F.2d at 456. Appellant asserts, providing no direct support, that the right to treatment implies that confinement must be at an appropriate facility, and that a "maximum security facility for the criminally mentally ill is patently not an appropriate facility for appellant who is not suffering from mental illness but from mental retardation, a mental defect." Appellant Br. 14. This is the reason, he argues, that separate facilities have been provided by statute for the civilly committed mentally diseased and mentally retarded. *See* 179 U.S.App.D.C. at ——, 553 F.2d at 114, *supra.*

■ Appellant overstates the scope of the right to treatment recognized by *Rouse v. Cameron.* The court stated in that case that "[t]he hospital need not show that the treatment will cure or improve [the patient] but only that there is a bona fide effort to do so." 125 U.S.App.D.C. at 371, 373 F.2d at 456. There is evidence in the record indicating that there has not only been a "bona fide effort" to treat appellant, but that the treatment provided is "suited to his particular needs" and that his condition has improved during his confinement to Saint Elizabeths. Appellant's IQ has risen from 55 to 65 during his commitment, R. 8, 18.[15] While appellant is still considered too dangerous to warrant unconditional release, his ability to interact with others, initially very minimal, has progressed to the point that the hospital superintendent recommended on January 30, 1973, that appellant be conditionally released on weekends.[16] His con-

---

**15.** This is, however, still within the range of Mild Mental Retardation. *See United States v. Masthers, supra,* 176 U.S.App.D.C. at 245 n. 16, 539 F.2d at 724 n. 16.

**16.** Dr. Robinson's letter of January 30, 1973 describes the marked improvement in appellant's condition:

> Mr. Jackson's situation on Ward 6 has changed since his transfer. He has become increasingly able to verbalize his feelings and has displayed a sense of humor and innuendo which suggest a considerable understanding of social interaction. He has worked regular-

ly and has in general adequately discharged his privileges, abusing them only insofar as he has returned in an intoxicated state on several occasions. There is no history of elopements nor suggestion that he has behaved in a belligerent or hostile manner towards women, although he was once found on the upper floors of another service in the company of a young lady. There was no indication of sexual aggression surrounding that incident. He has been apprehended on at least two occasions transporting liquor back onto the grounds for more physically

ditional release was granted and continues. There has been no showing "that the opportunity for treatment has been exhausted or treatment is otherwise inappropriate," 125 U.S.App.D.C. at 374, 373 F.2d at 459. When faced with a similar argument, this court previously held that it was "apparent from the record that treatment will be available . . . at St. Elizabeths" to a *civilly* committed patient who suffered from mental retardation, *In re Alexander, supra,* 125 U.S.App.D.C. at 355, 372 F.2d at 928. We now hold that on the record in this case it is equally apparent that adequate treatment is being provided to appellant.[17]

### B. *Cruel and Unusual Punishment*

■ Appellant also contends that his indeterminate commitment without proper treatment amounts to a life sentence without possibility of parole, and that this raises Eighth Amendment cruel and unusual punishment concerns. This court has noted that "[i]ndefinite confinement without treatment of one who has been found not criminally responsible may be so inhumane as to be 'cruel and unusual punishment.'" *Rouse v. Cameron, supra,* 125 U.S.App.D.C. at 368, 373 F.2d at 453. But under the court's suggestion in *Rouse,* an Eighth

Amendment claim must contain two elements, indefinite commitment *and* lack of treatment. We have held in the preceding subsection of this opinion that on the record, appellant has not been denied any right to treatment. The fact, standing alone, that appellant may never improve sufficiently to deserve his unconditional release does not call for his release. *See Overholser v. O'Beirne, supra,* 112 U.S.App.D.C. at 269, 302 F.2d at 854.[18] Appellant therefore has not demonstrated that construction of § 24–301(d) to provide for his indeterminate commitment to Saint Elizabeths would result in cruel and unusual punishment.

### C. *Equal Protection*

■ Appellant also asserts that the construction of § 24–301(d) accepted by the district court would deny him equal protection of the law.[19] He points out that this construction draws a distinction between mentally retarded individuals who have been acquitted of a crime by reason of insanity and those who have not. This distinction, he argues, deprives him of his fundamental right to liberty, and should therefore be subjected to the strict scrutiny of *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) and *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d

imposing patients with whom he values a relationship.
R. 15.

**17.** *Cf. Jackson v. Indiana,* 406 U.S. 715, at 730–31 n. 9, 92 S.Ct. 1845, 1854, 32 L.Ed.2d 435 (1972):
[N]othing in the record demonstrates that different or better treatment is available at a special institution than at the general facilities for the mentally ill.

**18.** Some advocate that a limit be placed on the commitment of defendants lacking criminal responsibility corresponding to the maximum prison sentence that would result from a conviction for the offense. In *Waite v. Jacobs,* 154 U.S.App.D.C. 281, 475 F.2d 392 (1973), this court remanded for consideration whether the government should bear the burden of proving that continued *civil* confinement of one incompetent to stand trial was justified beyond the terms of a potential criminal sentence. *Cf. Baxstrom v. Herold,* 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966); *United States ex rel. Schuster v. Herold,* 410 F.2d 1071 (2d Cir.),

*cert. denied,* 396 U.S. 847, 90 S.Ct. 81, 24 L.Ed.2d 96 (1969). Even if this concern would attach to one who has actually been acquitted of a crime by reason of insanity, as has the appellant in the present case, the potential sentence for the appellant's crime of rape is imprisonment for life, D.C.Code § 22–2801 (1973).

**19.** Neither party discusses the constitutional basis of such an "equal protection" claim. While the Fourteenth Amendment equal protection clause is by its terms applicable only to the states, the Fifth Amendment due process clause is applicable to the District of Columbia and has been construed to incorporate a guarantee of equal protection of the law. *See Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); *Davis v. Washington,* 168 U.S.App.D.C. 42, 43–44 n. 2, 512 F.2d 956, 957–58 n. 2 (1975) *rev'd on other grounds,* 423 U.S. 820, 96 S.Ct. 33, 46 L.Ed.2d 37 (1976); *Von Stauffenberg v. District Unemployment Compensation Board,* 148 U.S.App.D.C. 104, 106 n. 5, 459 F.2d 1128, 1130 n. 5 (1972).

231 (1960). He concludes that it should be struck down as unjustified by any compelling governmental interest. Appellant admits that the protection of community safety is a legitimate government interest, but asserts that other means of achieving this purpose are more appropriate and less restrictive, e. g., the civil commitment procedures of D.C.Code §§ 21–1101 to 21–1123 (1973), which would result in appellant's commitment to a facility designed for the treatment of mental retardation. Appellant also asserts that the failure of § 24–301(d) to distinguish between appellant and others committed to hospitals for the mentally ill is a denial of equal protection.

Appellant's equal protection claim appears to rest principally upon *Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972) and *Baxstrom v. Herold,* 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966). In *Jackson* the Court considered whether a mentally defective deaf mute defendant could be committed to a mental hospital for an indeterminate period when he was found incompetent to stand trial for two robberies involving four and five dollars. The petitioner argued that his commitment under the Indiana pretrial commitment statute, given his low probability of improvement, denied him due process and equal protection of law. The Court agreed with the petitioner, noting that the state's civil commitment procedures, providing different treatment facilities and more lenient release standards, were more appropriate for the case than the pretrial commitment statute.

The Court in *Jackson* relied heavily on its reasoning in *Baxstrom v. Herold, supra,* in which it had held that a state prisoner civilly committed to a hospital for the mentally ill at the end of a prison sentence must be afforded the same procedural protections made generally available by the state to other persons subject to civil commitment.

Neither *Jackson* nor *Baxstrom,* however, leads to the outcome appellant seeks. First, in neither case did the Court hold that strict scrutiny applies to procedures used for the criminal commitment of mentally ill persons. On the contrary, the Court in *Jackson* stated that the statutory scheme should be struck down only if there was no "reasonable justification" for it, 406 U.S. at 729, 92 S.Ct. at 1853. Similarly, the Court in *Baxstrom* scrutinized the statutory classification only to determine the existence of "some relevance to the purpose for which the classification is made." 383 U.S. at 111, 86 S.Ct. at 763.

 Thus, the statute here in issue must be upheld if there is a rational basis for the scheme it creates. The express purpose of the Congress in enacting the present § 24–301(d) was twofold: the protection of society and the protection and treatment of the acquittee. H.R.Rep.No. 91–907, 91st Cong., 2d Sess. 74 (1970), *supra.* As Congress noted, this purpose has been recognized by this court. *See, e. g., Overholser v. O'Beirne, supra,* 112 U.S.App.D.C. at 269, 302 F.2d at 854; *Ragsdale v. Overholser,* 108 U.S.App.D.C. 308, 312, 281 F.2d 943, 947 (1960). This court has consistently held that this purpose constituted a rational basis for treating defendants acquitted by reason of insanity differently from other persons. *Overholser v. O'Beirne, supra; Ragsdale v. Overholser, supra; Overholser v. Leach,* 103 U.S.App.D.C. 289, 257 F.2d 667 (1958), *cert. denied,* 359 U.S. 1013, 79 S.Ct. 1152, 3 L.Ed.2d 1038 (1959). This rationale applies as well to defendants acquitted by reason of insanity who are suffering from mental retardation. Retarded individuals who are acquitted by reason of insanity are not merely retarded individuals. Acquittal of a retarded individual by reason of insanity requires proof by a preponderance of the evidence not only of retardation but proof as well of a causal connection between the retardation and the individual's lack of behavior controls, *McDonald v. United States, supra,* 114 U.S.App.D.C. at 121, 312 F.2d at 850. *See* 179 U.S.App.D.C. at ——, 553 F.2d at 116 *supra.* It is this evidence, together with evidence of the acquittee's criminal conduct and consequent dangerousness, that provides a rational ba-

sis for treating him differently from civilly committed retarded or mentally ill persons.

■ This result is not inconsistent with the holdings in *Jackson* and *Baxstrom*. In *Jackson*, the defendant had not been charged with a violent crime, and there was no finding or suggestion that he was dangerous. His extreme lack of competence and the small sums involved in his thefts did not indicate excessive dangerousness. Moreover, the defendant in *Jackson* had never been tried for the crimes of which he was accused. In contrast, the appellant was charged with very dangerous crimes, first degree burglary and rape. His acquittal by reason of insanity rests upon a determination beyond a reasonable doubt that he did the acts of which he was charged. *United States v. Brown,* 155 U.S.App.D.C. 402, 406, 478 F.2d 606, 610 (1973); *Cameron v. Mullen,* 128 U.S.App.D.C. 235, 240 n. 12, 387 F.2d 193, 198 n. 12 (1967); *United States v. Shorter, supra,* 343 A.2d at 570 n. 2 (D.C.App.1975). The psychiatrists who have examined the appellant found and continue to find that he would be dangerous to himself and others if unconditionally released, R. 11, 18.

The Supreme Court in *Jackson* expressly recognized that the outcome in that case might have been different had a stronger showing of dangerousness been made and had the statute provided for release of committees who were no longer dangerous, 406 U.S. at 732–33, 92 S.Ct. at 1855. The Court distinguished and left standing *Greenwood v. United States,* 350 U.S. 366, 76 S.Ct. 410, 100 L.Ed. 412 (1956), which upheld the federal provisions for the pretrial commitment of persons incompetent to stand trial, 18 U.S.C. §§ 4244 to 4248. In *Greenwood,* the *Jackson* Court noted, there had been a specific finding that the committee was dangerous, and the sections were construed to provide for his release "when no longer

dangerous," 406 U.S. at 732, 92 S.Ct. 1845. Both of these conditions are satisfied in the present case. Appellant has been found to be insane by the trial court, and continues to be diagnosed as dangerous by the Saint Elizabeths staff. The statute on its face, § 24–301(e), provides for the release of committees determined no longer to be dangerous. Both *Greenwood* and the *Jackson* Court's reading of it thus support the position of the Government in the present case.

Appellant's reliance on *Baxstrom* is also misplaced. The Court in *Baxstrom* held that a defendant committed to a mental hospital at the end of a prison sentence is entitled to the same procedural protection as one civilly committed. The Court in *Jackson,* 406 U.S. at 724, 92 S.Ct. at 1851, approved the extension by this court in *Bolton v. Harris, supra,* and *Cameron v. Mullen, supra,* of the *Baxstrom* rationale to commitment following insanity acquittal. In *Bolton v. Harris,* this court construed the provisions of § 24–301(d) as it then read to provide persons acquitted of crimes by reason of insanity with a hearing prior to indeterminate commitment equivalent to that afforded persons civilly committed, 130 U.S.App.D.C. at 10 & n. 50, 395 F.2d at 651 & n. 50. This requirement was codified in slightly different form in the 1970 amendments to § 24–301, Pub.L.No.91–358, § 207 (July 29, 1970). The appellant was accorded such a hearing on March 28, 1969.[20] Appellant has not attacked the commitment procedure, but asserts only that acquittees of his class may not be committed for an indeterminate period under § 24–301(d)(2) because they are not "mentally ill." *Baxstrom* thus provides no support for his position.

The order of the district court is affirmed.

*Judgment accordingly.*

---

**20.** The court in *Bolton v. Harris, supra,* 130 U.S.App.D.C. at 10 n. 50, 395 F.2d at 651 n. 50, stated that "[w]here feasible, the requirements of the Hospitalization of the Mentally Ill Act as to notice, counsel, jury trial, etc. should be followed." Section 24–301(d)(2) requires a hearing before the court, unless waived. The

section provides procedures for this hearing, but does not expressly provide for a jury. Nevertheless, Judge Curran stated in his March 28, 1969, order that the appellant "waived a trial by jury on the question of his present mental condition . . . ." R. 12.

Also *see* note 14 *supra.*

## SUPPLEMENTAL OPINION ON SUG-GESTION FOR REHEARING

### En Banc.

Before BAZELON, Chief Judge, WRIGHT, McGOWAN, TAMM, LEVEN-THAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.

### ORDER

On consideration of the suggestion for rehearing *en banc* of appellant Daniel Jackson, and a majority of the Judges of the Court in regular active service not having voted in favor thereof, it is

ORDERED by the Court, *en banc*, that the aforesaid suggestion for rehearing *en banc* is denied.

Statement of McGOWAN, Circuit Judge, in which BAZELON, Chief Judge, LEVEN-THAL, ROBINSON and WILKEY, Circuit Judges, join, is attached.

### STATEMENT OF CIRCUIT JUDGE McGOWAN

In voting to deny rehearing *en banc*, it seems to me desirable to identify the considerations which have impelled me to do so.

Part I of the panel's opinion deals—correctly, I think—with the issue of whether D.C.Code § 24–301(d) (1973) includes within its coverage a person who is mentally retarded. In § 24–301(d) Congress addressed itself to the question of the disposition to be made of any criminal defendant who is found not guilty by reason of insanity. In this jurisdiction both mental disease and mental defect have always been regarded by this court as comprehended within the criminal insanity defense. There is no reason to believe that, in providing in terms for the commitment of any such defendant to a hospital for the mentally ill, Congress intended to include the one and not the other. Thus, insofar as this issue of statutory interpretation is concerned, there

seems clearly to be no occasion to *en banc* this case.

This statutory interpretation question was the only issue raised in the District Court in appellant's motion for unconditional release and in the supporting memorandum of points and authorities. At the oral hearing held by Judge Gasch on the motion, it was the only question pressed upon the court by counsel who, in response to Judge Gasch's express invitation, disclaimed any purpose or need to adduce evidence, except as the Government might challenge the fact of appellant's retardation. There being no such challenge, appellant's counsel saw no need for the taking of evidence, and none was taken. Counsel never contended in this hearing that appellant was not in fact receiving proper treatment and, of course, no evidence was adduced with respect to that question.

As Part II of the panel's opinion recognizes, only for the first time on appeal was the claim made that appellant was being deprived of his constitutional right to appropriate treatment; and the panel expressly stated that the District Court had been denied "an opportunity to make findings of fact relating directly" to this and the associated constitutional claims. Despite this, the panel in Part II went ahead—improvidently, I think—to deal with the right to treatment argument, and concluded its discussion of that matter by purporting to "hold that on the record in this case it is equally apparent that adequate treatment is being provided to appellant." Since the panel had stated in terms that no record regarding adequacy of treatment had been made in the District Court in this case, it seems anomalous that the panel should have affected to make a ruling by reference to isolated statements in past proceedings not directly focused upon the treatment issue. I do not think that that "holding," or anything else that is said in Part II of the opinion, has any binding effect on anyone. I also do not believe that the work of this court permits it the luxury of putting cases *en banc* simply for the purpose of eradicating *dicta*.

This has not been a right to treatment case from its very inception, but that is the issue which sparks the petition for rehearing *en banc*. I can understand the concerns of those who are described as having expressed alarm with the "holding" in Part II of the panel opinion with respect to treatment, but it is an alarm which is surely unfounded when Part II is placed in the proper perspective.

I do not denigrate the seriousness or the importance of the issue of right to treatment in the case of one situated as is appellant. It is, however, an issue which may be raised by the initiation of a proper proceeding in the District Court—a proceeding which will inevitably entail extensive evidentiary exploration of many specialized areas of knowledge, such as the nature of mental retardation, the kinds of treatment appropriate for it, and the availability of such treatment. Considerations of orderly procedure lead me to think that the time has come to end this non-treatment case, leaving appellant and his counsel free hereafter to initiate a true right to treatment case if they should be so advised.

### STATEMENT OF CHIEF JUDGE BAZELON

I join Judge McGowan's statement but think that one point deserves further clarification. Section 301(d) states: "If any person . . . raises the defense of insanity and is acquitted solely on the ground that he was insane at the time of its commission, he shall be committed to a hospital for the mentally ill. . . ." In both the District Court and the Court of Appeals, appellant raised the question of whether the commitment mandated by this section extended to the mentally retarded as well as the mentally ill; appellant did not present either court with the issue of *where* commitment should occur if § 301(d) were found applicable or whether "a hospital for the mentally ill" might include facilities other than St. Elizabeths. In any new action brought by appellant, I would hope that these legal questions would be considered along with the factual issues suggested by Judge McGowan, including which government facilities in the District of Columbia provide suitable care and treatment, by education and training, for the mentally retarded.